UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT PIKEVILLE
CIVIL ACTION NO. 7:19-cv-00046-REW

RANDY BRYANT PLAINTIFF

VS:

FLOYD COUNTY FISCAL COURT and ROBERT WILLIAMS, FLOYD COUNTY JUDGE EXECUTIVE, Individually and in his Official Capacity DEFENDANTS

INDEX


| Name of Witness: RANDY LYNN BRYANT | Page Number |
|---|---|
| Caption and Appearances. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 - 2 |
| EXAMINATION By Mr. Conley . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 - 57 |
| EXAMINATION By Mr. Webster . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 58 - 62 |
| RE-EXAMINATION By Mr. Conley . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 62 - 63 |
| Reporter's Certificate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 64 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT PIKEVILLE
CIVIL ACTION NO. 7:19-cv-00046-REW

RANDY BRYANT PLAINTIFF

VS:

FLOYD COUNTY FISCAL COURT
and ROBERT WILLIAMS, FLOYD
COUNTY JUDGE EXECUTIVE,
Individually and in his
Official Capacity DEFENDANTS

---

DEPOSITION OF
RANDY LYNN BRYANT

---

The deposition of **RANDY LYNN BRYANT** was taken pursuant to Notice To Take Deposition on Tuesday, December 17, 2019, at the Law Offices of Lawrence Webster, 206 Second Street, Pikeville, Kentucky. Said deposition to be used for the purpose of discovery and to be used for any and all purposes permitted by the Federal Rules of Civil Procedure on behalf of Defendants herein.

Plaintiff-Deponent was represented by counsel, Hon. Lawrence R. Webster, P.O. Drawer 712, Pikeville, Kentucky, 41502.

Defendants were represented by counsel, Hon. Shawn C. Conley, appearing on behalf of Hon. Jonathan C. Shaw, both of Porter, Banks, Baldwin & Shaw, PLLC, P.O. Drawer 1767, Paintsville, Kentucky, 41240.

**********************************************

**RANDY LYNN BRYANT,** the witness, after first being duly sworn, was examined and states as follows:

EXAMINATION

By Mr. Conley

Q1 Go ahead and state your name for the record, please.

A Randy Lynn Bryant.

MR. CONLEY:

Mr. Bryant, my name is Shawn Conley and along with a fellow named Jonathan Shaw, we represent Mr. Williams and the Floyd Fiscal Court in this case.

Q2 Have you ever given a deposition before?

A Yes.

Q3 What kind of case was it?

A It was a assault case.

Q4 Was it a civil case or a criminal case?

A. Civil.

Q5 Did you sue someone or did someone sue you?

A I sued someone.

Q6 Where was that case, was that in Floyd County?

A It was.

Q7 Did you go in front of any of the Judges down there or anything like that?

A No, sir.

Q8 Was it resolved out of Court?

A Yes, sir.

Q9 How long ago was that, Mr. Bryant? I think you put that in your discovery --

A Um hmm.

Q10 -- responses actually. Don't recall?

A Probably about 14 years ago or something.

MR. CONLEY:

Well, I got a little off track there. The reason I asked if you had ever been in a deposition before was there are certain ground rules that we kinda follow when we're doing one of these; and since it's been a while, I'm gonna go through those with you again really quick. As you and I are talking here today, I'm gonna be asking you a series of questions about who you are, about your case and some background information, that kind of thing. As I'm doing that, this nice lady to my right here is

MR. CONLEY [continued]:

gonna be taking notes and she's looking down at that notepad and she's not looking at you and I when we talk and so if we don't give verbal responses to one another -- if I'm not speaking and you're not answering with "yes" or "no" and we're shaking or nodding our heads, she's not gonna pick that up. So, it's important for the purpose of the record, and for me, Mr. Webster, and whoever else may this read this transcript later down the road to understand what we talked about, that you and I do a good job of just making sure we speak up and say "yes" or "no," and that kind of thing, okay?

RANDY LYNN BRYANT:

Yes, sir.

MR. CONLEY:

You're doing great, thank you. This deposition won't take a terrible long time but to the degree that you might need a break or if you need to use the restroom or anything like that, just let us know, okay?

RANDY LYNN BRYANT:

Yes, sir.

MR. CONLEY:

Now, I'm gonna ask like I said a bunch of questions and none of them should be too complicated; but sometimes I ask questions that just don't make any sense and I'm not doing it on purpose; it's just my brain is not always working the right way. So, if I do that, please let me know, okay?

RANDY LYNN BRYANT:

Yes, sir.

MR. CONLEY:

I want you to be comfortable in speaking up and telling me that you don't understand what I'm asking you, okay?

RANDY LYNN BRYANT:

Okay.

MR. CONLEY:

'Cause if you answer the questions I ask, I'm gonna assume you understood them all, okay?

RANDY LYNN BRYANT:

Yes.

MR. CONLEY:

With all that being said, let's talk a little bit about your background --

RANDY LYNN BRYANT:

Yes.

MR. CONLEY:

-- and I wanna start with where you live.

Q11 What's your address?

A 21 Pivot Rock Road, Martin, Kentucky.

Q12 And that's the address that you provided in your discovery responses. How long have you lived there?

A Probably about 22 years, 3.

Q13 Do you live there alone?

A No, I live with my wife and three children.

Q14 What's your wife's name?

A Jill Dotson-Bryant.

Q15 Dotson being her maiden name?

A Yes; hyphenated, Bryant.

Q16 Does Miss Bryant work anywhere in Floyd County?

A She does.

Q17 Who does she work for?

A She works for Kentucky Oil.

Q18 Kentucky Oil?

A Yes, sir.

Q19 What does she do for them?

A She's a office worker.

Q20 Is her office in Prestonsburg?

A No, it's at Betsy Layne.

MR. CONLEY:

Now, some of these questions I'm gonna ask you may eventually give us information when we're picking the jury. Now, this is a federal case so we're drawing from a much bigger pool but I still need to know a little bit about you and your family.

RANDY LYNN BRYANT:

Yes, sir.

Q21 Now, your children, are any of them adults, over 18 I mean?

A My oldest daughter will turn 20 December the 31st.

Q22 What is her name?

A Megan Reece Bryant.

Q23 Is Megan in school anywhere?

A She is.

Q24 Where does she go to school?
A Morehead University.
Q25 But she still lives with you all?
A Well, right now, she's staying at Morehead while she's going to school but she will be.
Q26 I guess she could be called for jury duty possibly. I mean her residence is officially there at Pivot --
A Yes.
Q27 Pivot Rock Road --
A Um hmm.
Q28 -- is that right?
A Correct.
Q29 The other two kids under 18?
A Yes.
Q30 Where do they attend school?
A Betsy Layne High School.
Q31 Any of them involved in sports or anything like that?
A Not currently. I have -- my youngest daughter's involved in music at -- but not at the school.
Q32 Are your parents still living?
A No, sir.

Q33 Any brothers or sisters that live down in Southeastern Kentucky, either Pike, Floyd --

A No, sir.

Q34 I can't remember what all counties they draw the jury from but would you agree --

MR. CONLEY:

Larry, would you agree to provide a list of his relatives that are in the applicable counties?

MR. WEBSTER:

If I can remember them.

MR. CONLEY:

I can't remember them off the top of my head. I know they draw from Pike, Johnson, Letcher, Martin probably.

MR. WEBSTER:

And Knott.

MR. CONLEY:

Knott. And he pro' -- from the sounds of it, I don't know that he would have a big list of them.

RANDY LYNN BRYANT:

I don't have brothers or sisters.

MR. CONLEY:

Well, you make it lot easier on me then.

Q35 Mr. Bryant, are you currently employed?

A I am.

Q36 Who do you work for?

A Floyd County Sheriff's Office.

Q37 You work for Mr. Hunt?

A I do.

Q38 What do you do for the Sheriff's Office?

A I'm Courthouse Security Officer.

Q39 What Courtroom or what area of the Courthouse are you assigned?

A My main one is Family Court but I work in all of them.

Q40 So you work for Judge Marshall?

A I do. Well, I work for --

Q41 I mean you work for Sheriff Hunt but you're in Judge Marshall's Courtroom.

A That's my main one but I work in all of them.

Q42 How long have you been in this position?

A May or June or maybe in April.

Q43 Of 2019, correct?

A Yes.

Q44 This is the first job you've had since you were terminated as the Code Enforcement Officer.

A Yes, sir.

Q45 And had you worked for the Sheriff's Department before this?

A No, sir.

Q46 What is your rate of pay?

A $10 an hour.

Q47 Do they offer any benefits?

A Yes, sir.

Q48 What all do they offer you there?

A I have hospital insurance.

Q49 So you got health insurance?

A Health insurance, yes, on myself.

Q50 On yourself?

A Yeah.

Q51 What about, do they offer dental, vision, anything like that?

A Yes, I think so.

Q52 Do you have vacation time there?

A Yes.

Q53 How much vacation time do you have?

A I really don't know. I think get about -- I'm not sure.

Q54 Accrue so much a month maybe --

A Yes.

Q55 -- or something?

A [No additional response.]

MR. CONLEY:

And we can follow up with that.

Q56 Did you have to have any special training to serve as a Deputy?

A Yes, sir.

Q57 Did you have to go to a school or something?

A Yes, sir.

Q58 Where did you go?

A Richmond to the Academy.

Q59 When did you do that?

A In October.

Q60 Of this year?

A Yes, sir.

Q61 Did you complete that?

A I did.

Q62. How many week course was that?

A It was a two-week.

Q63 Was that specialized for like Court security --

A Yes, sir.

Q64 -- as opposed to like somebody that's out patrolling the roads?

A Yes, sir.

Q65 That one's a little longer, isn't it?

A Oh, yeah, lot longer.

Q66 So before you worked for the Sheriff's Department you were, of course, what, the Code Enforcement?

A Yes.

Q67 What was the official title of that position?

A Code Enforcement Officer; Floyd County Code Enforcement Officer.

Q68 And as Code Enforcement Officer, what were your job duties?

A To enforce any of the ordinances that the county had in place such as illegal dumping, illegal burning, any dilapidated buildings; dealt with, you know, county roads, people -- ditchlines, you know, people putting things in them or obstructing.

Q69 Was that -- were you working off of complaints basically or were you out kinda looking around for things?

A Both.

Q70 Both; so, if someone called you and said, "Hey, my neighbor's got a bunch of trash in the ditch," how did you handle something like that?

A I would go look at it and see if there was a problem and then talk to the people and see if we could work the problem out.

Q71 Did you have any type of authority in which you could charge them or cite them?

A Yes, sir.

Q72 Citation authority?

A Yes, sir.

Q73 What kind of training did you have to be a Code Enforcement Officer, what was the educational or training requirements?

A There wasn't any. I trained pretty much on the job. There was certain classes after I got started that I attended.

Q74 What kind of classes?

A Tire amnesty classes and floodplain classes and --.

Q75 Tire amnesty, I think I might know what that means but could you explain that for me?

A They just talked about, you know, people illegally dumping tires, and what to look for. They had a thing where, you

know, they collected tires ever three years; people brought them to a certain spot and they would pick them up.

Q76 How long did you serve as Code Enforcement Officer?

A About 12 years, I guess.

Q77 And who -- who was your direct supervisor?

A Lon May.

Q78 How long was -- was he your supervisor the whole time you were Code Enforcement --

A Till -- almost till the end, then he retired.

Q79 What was his title?

A He was Floodplain Coordinator.

Q80 So the Code Enforcement Officer reported to the Floodplain Coordinator?

A He was also the Solid Waste Coordinator as well. Yeah, and I did -- yeah, I reported to Solid Waste Coordinator.

Q81 Who hired you in as Code Enforcement Officer?

A Robert Marshall.

Q82 Was he County Judge Executive?

A He was.

Q83 What year was that, if you recall?

A I think about 2007.

Q84 2007. Now, was he an incoming County Judge Executive at the time you were hired or was he already -- had he already been in that position for a while?

A No, he was incoming. Oh, he was already the Judge but I already worked for the Fiscal Court.

Q85 What was your role, was it the jail?

A I worked at the jail, yeah, for --

Q86 You were a Deputy Jailer?

A Yes, sir.

Q87 How many years were you Deputy Jailer?

A About three and a half.

Q88 So that would've been before 2007 --

A Yes.

Q89 -- taking you back to roughly 2003-2004?

A 2003.

Q90 Did you have any special training as a Deputy Jailer?

A Not before that but they gave -- gave us training as we worked, you know, with our classes.

MR. CONLEY:

Right; it seems like they have to have so many hours a year.

RANDY LYNN BRYANT:

Yes, sir.

Q91 So while you were working for the Fiscal Court, did you ever engage in any campaigning for Judge Marshall?

A Yes, sir.

Q92 You campaigned for him?

A Yes, sir.

Q93 When you campaigned for Judge Marshall, did you put up signs, did you attend rallies? I mean what kind of things did you do with him?

A Both.

Q94 Put up signs in your yard?

A Not in my yard.

Q95 You went out and put up signs in other folks' yards?

A Yeah.

Q96 Did you contribute to his campaign?

A Not financially, no.

Q97 But you gave him your time.

A Yeah.

Q98 Do you know when you would've first -- what election, what year the election was that you first campaigned for Judge Marshall?

A Ah, he probably went in about 2006 maybe.

Q99 '06; and would you have participated in that campaign?

A Yeah.

Q100 Were you ever told by Judge Marshall or ever offered a position by Judge Marshall because of your assistance in campaigning for him?

A He said if anything ever come open.

Q101 He told you he'd hire you?

A He would try to.

Q102 And then he eventually did, correct?

A Yeah, when the Code Enforcement Officer retired, there came an opening.

Q103 Who was the Code Enforcement Officer before you?

A Lindsay Hunt.

MR. WEBSTER:

Is that a male or a female?

RANDY LYNN BRYANT:

Male; it's John Hunt's father.

Q104 And he retired from that position?

A Yes, sir.

Q105 He wasn't terminated?

A No, sir.

Q106 Did Lindsay help you in terms of like training or getting you up to speed on how to do the job?

A No, sir, I -- he retired and then I got a job. Lon May had previously been a Code Enforcement Officer and he trained me.

Q107 And you worked with him.

A Yes, sir.

MR. CONLEY:

Let me back up real quick, Mr. Bryant. I forgot to ask you a few background questions.

Q108 Did you grow up in Floyd County?

A All my life.

Q109 What part of the county did you grow up?

A Well, I's raised up at Price, Kentucky.

Q110 And where did you go to high school?

A McDowell.

Q111 What year did you graduate from McDowell?

A 1976.

Q112 Did you go to college anywhere?

A No, sir.

Q113 Where did you go to work after you graduated high school?

A As soon as I graduated high school, I worked for a short time for Kentucky-West Virginia Gas just like pickup labor stuff; and then I worked for the Kentucky State Parks; and then after that, I went to work in the coalmines.

Q114 You worked for several different companies?

A No.

Q115 Who did you primarily work for?

A I worked for -- well, one company had different names but it was the same -- Colemans, Roger Coleman.

Q116 Roger Coleman?

A Yeah; and Larry and Terry Thornsbury. That was my two main.

Q117 What did you do in the coalmines?

A I run a shuttle car most of the time.

Q118 So you were underground?

A Yeah, the whole time.

Q119 What mine did you work at?

A When I first started, I started for Larry and Terry Thornsbury at Spewing Camp; and I worked up there for a few years and then they went to Martin to Warco and I went with them. Then they sold out to Coke Carbon, I worked for them briefly. Then I went to the Colemans at Emily, RBM Enterprise and they changed the name two or

three times to Emily Enterprise and different names but the same coalmines. I worked 17 years altogether in the coalmines.

Q120 Most of it in Floyd County?

A All; all of it in Floyd County.

Q121 All of it in Floyd. All of it underground?

A Yes, sir. Well, first few months I worked outside in Spewing Camp but that was it.

Q122 Were you ever injured or anything in the mines?

A One time. I's off work probably couple weeks or something.

Q123 Do you take any medications that would --

A None.

MR. CONLEY:

Well, hang on just a second.

RANDY LYNN BRYANT:

Okay.

Q124 I was gonna ask you, are you on any medications that would affect your ability to answer questions truthfully, or your memory, or anything like that?

A No, sir.

MR. CONLEY:

Okay, that's all I needed to know. Thank you.

Q125 You've been in a previous civil lawsuit over an assault. Was that -- you said Floyd County, correct?

A Yes, sir.

Q126 Who was the defendant in that?

A Ross Gibson.

Q127 Was that over anything to do with your employment?

A No, sir.

Q128 Personal matter?

A Yes, sir.

Q129 Any other lawsuit for car wrecks or --

A No.

Q130 -- wrongful discharge, anything like that?

A No; there was another -- another civil case a long time ago.

Q131 Do you recall what it was --

A It was in Floyd County. It was just a -- got in a fight with a guy.

Q132 Were you the defendant in that case?

A No. Yeah, I was the defendant.

Q133 But it was civil, not criminal.

A Civil.

Q134 Do you have any felony convictions?

A No, sir.

Q135 Any misdemeanor charges other than a traffic ticket or something?

A Maybe years ago, may had a AI, probably been over 30 year ago or something.

MR. CONLEY:

Not too many people don't have one of those somewhere.

A Well, I had -- I did -- I had a DUI 20 some year ago, maybe.

Q136 It's been a long time ago.

A Oh, yeah.

Q137 Now, you alleged some I guess embarrassment, anxiety, that kind of thing, over your termination. Have you had to seek any medical treatment for that?

A No, sir.

Q138 Not seen a psychiatrist or a counselor?

A No, sir.

Q139 I wanna go through your discovery responses with you and particularly, I'm gonna go through this list of folks that you, through your attorney, have provided that will be potentially witnesses in this case. First one, obviously, it's you. So. we'll talk about what you know, what you have to say. The next one is Wesley Gearhart.

A Uh huh, yes.

Q140 Mr. Gearhart, who is he?

A He's a guy that I grew up around at Price.

Q141 Is he somehow tied to either Mr. Williams or Mr. Hale, or --

A Yes, he's friends with Robbie Williams.

Q142 The current Judge?

A Yes, sir.

Q143 And he is a -- he's from Price?

A Yes, sir; he was a neighbor of mine growing up.

Q144 Do you know where Mr. Gearhart works?

A He's retired.

Q145 Have you and Mr. Gearhart discussed your termination?

A No, sir.

Q146 Do you know or what do you expect Mr. Gearhart would tell us if we asked him what he had to say about this case or about your situation there at --

A Well, of course, I'd assume he'd tell the truth.

MR. CONLEY:

Right; but I don't know what that truth is; that's what I'm trying to find out.

A He's the one that introduced me to Robbie and he told Robbie, you know, that -- that I done a good job at working, he'd hate to see me lose my job; and Robbie assured him, you know, that he wasn't running to terminate anybody; that he was just running to try to do a good job for the county; and Mr. Gearhart told him, you know, that he would help him and he was -- he campaigned for him.

Q147 Gearhart campaigned for Mr. Williams?

A Yes, sir.

Q148 Now, these conversations between Mr. Gearhart and Mr. Williams, were you present for any of those?

A Just the -- the one meeting and then Mr. Gearhart told me a time or two that Mr. Williams had called him and assured him, you know, that I's gonna be fine; that I'd have a job. When I found out or had heard that Mr. Williams was gonna terminate me a few weeks before he took office or whatever, I called Mr. Gearhart and told him, you know, that I think things must've changed. He said, "Well, I'll call him," and then he called me back and he said, 'Yeah, he said that he was gonna put his own people in office that helped him get elected."

Q149 Did he say anything derogatory about you or mention you specifically?

RANDY LYNN BRYANT:

Mr. Williams?

MR. CONLEY:

According to what Mr. Gearhart told you. I know we're talking about hearsay.

A Oh, no; he just said he's gonna put his own people in office.

Q150 The next is Ben Hale, who is the former County Judge.

A Well, I worked for Ben three or four years and, well, Ben can tell you what kinda job I done as the Code Enforcement Officer.

Q151 Do you think Ben will tell us you did a good job?

A I'm sure he will. I never had any problems, was never --.

MR. CONLEY:

Yeah, that's a good -- I'm glad you mentioned that.

Q152 During your time as Code Enforcement Officer, did you have any discipline problems?

A Never.

Q153 You were never disciplined?

A At no -- no job I ever had.

Q154 Were you ever written up for anything?

A No, sir; not to my knowledge.

Q155 Did anybody ever complain to you about your job performance?

A Just people that I'd take to Court.

Q156 Right. The folks that you were citing?

A Yes, sir.

Q157 I guess you wouldn't be doing a good job if you didn't have that.

A Right.

Q158 So Mr. Hale, what I'm reading here on your discovery responses, will tell us that you did a good job, or about your job performance; but it also mentions that you expect him to have information about the political nature of your termination. Can you explain to me what Mr. Hale may be able to tell us about the political aspect of your termination?

A Well, I would imagine, you know, I -- I campaigned for Ben Hale. I worked for him. I did campaign for him. I hung signs for him.

Q159 So you campaigned for Mr. Hale and you believe that because of your campaigning for Mr. Hale that that was why you were ultimately terminated?

A I think it had a lot to do with it. Mr. Hale was for Mr. Rose. They were both democrats and I think Ben stuck with his party and I -- I feel that that's why that Robbie got rid of me.

Q160 Mr. Hale, he lost the primary, correct?

A Yes, sir; to Mr. Rose.

Q161 Did you campaign for Mr. Rose?

A No.

Q162 And you didn't campaign for Mr. Williams either, correct?

A No. I tried to remain --

Q163 Neutral?

A I wanted to keep my job.

Q164 Rose or Williams.

A But I did campaign for Mr. Hale.

Q165 And then the next fellow you got listed is former Judge Marshall and it looks like he'll just be able to tell us what kind of job you did.

A I worked for him for eight years.

Q166 Does he have any information that would be -- that would tell us anything about the termination or --

A No, just job performance.

Q167 Gary Garrett; I know Mr. Garrett, he's former Road Foreman, correct?

A Yes, sir.

Q168 Gary will just tell us you did a good job.

A Yeah, I worked some with him.

Q169 Tyler Green, who is the Assistant County Attorney, he would be able to tell us about how you prosecuted folks --

A Yes, sir.

Q170 -- who violated code.

A Exactly.

Q171 David Cooley, who is he?

A He runs the transfer station.

Q172 For like the garbage?

A Yes, sir.

Q173 And that would again just be somebody that would talk about your job performance?

A Yes, sir.

Q174 Now, you anticipate -- you've listed Robert Williams, who is of course my client --

A Yes, sir.

Q175 -- and you believe that he will testify or should testify that you were terminated for political reasons?

A If he tells the truth, he will.

Q176 And you believe that -- that he terminated you so he could hire people that supported him?

A I do.

Q177 Do I have a correct understanding of your ---

A I do believe that, yes.

Q178 Now, Joe Reynolds; is he the current Code Enforcement Officer?

A He is.

Q179 Have you spoken with Mr. Reynolds about this case?

A No, sir.

Q180 If we take Mr. Reynolds' deposition or you take -- your attorney does, do you anticipate him to talk about his political connections to Mr. Williams?

A I assume he would, yeah.

Q181 You believe he campaigned for Mr. Williams?

A I -- I do.

Q182 In your discovery responses -- and this may very well have been your attorney and I don't wanna know anything you and your attorney talked about, I'm not asking about that. Did you provide your attorney with any copies of Facebook postings or anything like that?

A Yes, sir.

Q183 You were the one that found those?

A Yes, sir.

Q184 And those Facebook postings, they were from Mr. Reynolds?

A They were on his Facebook, yes, sir.

Q185 Right; on his page?

A Yeah, pictures and stuff.

Q186 And those were just his campaigning in support of Mr. Williams' --

A Yes, sir.

Q187 -- campaign?

A Yes, sir.

Q188 Dale Johnson who works in the PVA?

A Yes, sir.

Q189 He just can tell us about your job performance?

A That, and he can tell you that Mr. Williams, also in person, assured me that my job would be fine, you know; he didn't want me out campaigning against him.

Q190 Did Mr. Williams tell you that? I'm sorry, I didn't -- I didn't understand what you just said.

A Mr. Johnson --

MR. CONLEY: Right.

A -- was with Mr. Williams and they stopped as I was beside of the road and assured me that I wouldn't lose my job, you know.

Q191 Was that coming from Mr. Johnson or from Mr. Williams?

A Mr. Williams. Mr. Johnson was present.

Q192 How many times did Mr. Williams discuss with you, before the election was over, that -- you know, discuss your -- your future, your job there as Code Enforcement Officer?

A Just with Mr. Gearhart and there was some other people, too, that he told, you know, if I didn't get out and campaign against him, these people would be for him that, you know, he wouldn't --.

Q193 Can you -- are there any other names other than the ones that we've discussed?

A Yes, there is.

Q194 Can you tell me who those people would be?

A Hubert Spurlock was one of them; Donnie Mullins.

Q195 Donnie Mullins. Who else?

A That's two that just pops in my mind.

Q196 If you think of anybody else, would you --

A There is other people but they don't want their name mentioned and I don't wanna jeopardize them. They have ties with

Mr. Williams, I guess. A lot of people won't testify against Mr. Williams because, you know, he's a powerful man in the county and I guess they're afraid they won't get a gravel.

Q197 Let's talk about the ones you can disclose; Mr. Spurlock, who is he?

A He cam' -- he was campaigner for Mr. Rose.

Q198 Does he work for the County?

A No, sir.

Q199 What about Donnie Mullins?

A He is my first cousin and Mr. Spurlock stopped campaigning with him; and, of course, Mr. Mullins told him that he would help Mr. Williams, you know; but, you know, he didn't want me to lose my job and Mr. Spurlock talked to Mr. Williams and Mr. Williams assured Mr. Spurlock that he wasn't running to get rid of people.

Q200 When you were -- when you were on the side of the road and Mr. Johnson, Dale Johnson, and Mr. Williams stopped to talk to you, was this before or after the election?

A Before the election.

Q201 Do you know the relationship between Mr. Johnson and Mr. Williams, why they would've been out running around before the election?

A He campaigned with him. They were out campaigning.

Q202 Was Mr. Johnson also running for office at that time?

A No, sir.

Q203 Oh, he worked in the PVA's Office.

A He worked and still does.

Q204 He wasn't the PVA.

A No, he's not the PVA. He just works in the office.

Q205 And then Sharon May, who was Ben's secretary.

A Exactly.

Q206 She can just tell us about your job performance.

A Yes, sir.

Q207 So I believe in your discovery responses you provided a copy of a letter that was sent to you notifying you of your termination.

A Yes, sir.

MR. CONLEY:

Let's go off the record.

(Reporter's Note:

There being no objection, record stopped briefly, continuing as follows:)

MR. CONLEY:

Larry, it's just that letter you all provided.

Q208 I'm gonna hand you what appears to be a letter addressed to you from Robbie Williams.

A Yeah, that's it.

Q209 How was that delivered to you?

A Hand-delivered at the Courthouse.

Q210 By who?

A I think Mr. Williams handed it to me.

Q211 Did you all have any conversation when he handed that to you?

A Yeah.

Q212 Tell me what was said.

A He said that it didn't have anything to do with my performance, that he was just replacing me with somebody.

Q213 Did you have any comments or make any --

A He -- he told me that later on down the road that he might try to find me something.

Q214 Did you -- were you aware you were being terminated before you received this letter?

A Yes, sir.

Q215 How were you made aware of that?

A Just people I know told me that Mr. Williams had told them and then I went and asked Mr. Williams in his office and he and I had a conversation then.

Q216 Do you recall when that would've taken place?

A I have notes of it. It was before he took office.

Q217 This would've been before January 1, I guess?

A Yes, sir.

Q218 And that conversation you had with Mr. Williams, that was over at the old Courthouse, correct?

A [No verbal response.]

Q219 No?

A No, at his office.

Q220 Where was his office?

A It's on 23, his insurance office.

Q221 His agency.

A Um hmm.

Q222 Was it a cordial conversation, confrontational, how did it go?

A It was cordial; I respected him, he respected me.

Q223 And at that time, what did he tell you?

A He told me that the reason he was -- I asked him why he was terminating me and he said it didn't have anything to do

with my job performance; it didn't have anything to do with politics, far as me campaigning or whatever but the people that helped him get elected and put in office, that he was gonna give them jobs in the Courthouse.

Q224 This is dated -- well, this isn't dated but it's --

A I think he took office January 7th.

Q225 It says "effective January 7."

A The morning he took office is the morning he give me that; of course, he couldn't terminate me before he was Judge.

Q226 But you were aware it was gonna happen.

A Yeah, he told me it was.

Q227 And that's the only two times you had a conversation with Mr. Williams about your termination?

A Yeah; yeah, it wasn't much of a conversation when he handed me that but --

Q228 Right; but those are the only two times you spoke with him.

A Yeah, except a couple times that he was with Wes Gearhart and --

MR. CONLEY:

Right; and that's probably an example of a poor question.

Q229 Those are the only two times you discussed with Mr. Williams your termination, that you were not being --

A Yes, yes.

Q230 How often was your position appointed or reappointed?

A Far as I know, they never appointed somebody unless somebody quit, or retired, or --.

Q231 Well, you provided a bunch of resolutions in your discovery responses and it looks like from the Floyd County Fiscal Court Meeting, and I just was curious if every year, they just --

A They renew them ever time a new Judge -- ever time a Judge gets reelected or a new Judge comes in, I guess.

Q232 So when you were hired in, Judge Marshall was the County Judge Executive, correct?

A When I's hired for Code Enforcement Officer, yes.

Q233 Code Enforcement, I'm sorry.

A Yes, sir.

MR. CONLEY:

Thank you for clarifying that.

Q234 And then at some point, Judge Marshall, was -- was he beat by Ben Hale or just --

A No, he just didn't run.

Q235 He just didn't run and so, Ben's elected.

A Um hmm, yes.

Q236 Were those the only two County Judges you worked for?

A No.

Q237 Who else did you work for?

A I worked for -- well, Paul Hunt Thompson was the Judge when I worked for the Jailer.

Q238 And I'm sorry, Mr. Bryant. I'm focused just on your time as Code Enforcement.

A Yes, sir.

Q239 When you were hired as Code Enforcement, Marshall was the Judge.

A Yes, sir.

Q240 Then who preceded Marshall -- who came after Marshall?

A Ben Hale.

Q241 Ben Hale.

A Judge Marshall had it for two terms, which is eight years; then Judge Hale had it for four years.

Q242 So that's 12 years.

A 12 years.

Q243 And in those 12 years as Code Enforcement Officer, you worked for two County Judges.

A Yes, sir.

Q244 When Judge Marshall was reelected for his second term --

A Yes, sir.

Q245 -- was your position -- did it have to be officially reappointed by resolution?

A I think; I'm not sure, I think so.

MR. CONLEY:

I didn't tell you this at the beginning, Mr. Bryant, but if you don't know something, just tell me you don't know and I'll move on.

RANDY LYNN BRYANT:

Right.

Q246 Then when Ben Hale was elected, do you believe that you were appointed again?

A Yes, sir.

Q247 But you didn't have to -- it wasn't an annual thing; it didn't have to happen ever year?

A No; I think ever four years.

Q248 When you were employed as Code Enforcement Officer, how did you get paid, by the hour or was it salary?

A Salary.

Q249 What was your salary?

A I'm not real sure. I think I've given Mr. Webster --

MR. CONLEY:

You have and I just was --

A -- those figures. It's around --

MR. CONLEY:

I'm gonna save you the guess.

Q250 According to your discovery responses, your former salary was $2,750 per month; does that sound right?

A Yeah, probably. That's probably right.

Q251 Have you provided Mr. Webster with your tax returns?

A Yeah, I think.

RANDY LYNN BRYANT:

Did I?

A I think -- I think I did.

MR. CONLEY:

I didn't see those in there, Larry, but --

MR. WEBSTER:

They'll be right here if he did.

MR. CONLEY:

And we may not have -- we may not have asked for them and if we haven't, I'll file a --

MR. CONLEY [continued]:

I'll send you a supplemental request just to verify his income.

Q252 According to your discovery responses, you're now making 1625 a month.

A That sounds probably about right.

Q253 So you were making more money as Code Enforcement.

A Yeah.

Q254 How many weeks' vacation did you have as Code Enforcement Officer?

A I think I had four.

Q255 That's what it says here, four weeks' vacation; and how many do you have now as a Deputy Sheriff?

A I'm not real sure; I think, one.

Q256 One week. Can you get more as you progress with --

A You know, I'm not real sure where I not been working there long. I didn't ask a whole lot of questions, I's just tickled to get a job.

Q257 Now, you were terminated January the 7th, did you file for unemployment?

A Yes, sir.

Q258 Did they contest your unemployment --

A No.

Q259 -- that you know of?

A Not as I know of.

Q260 And how long did you draw unemployment?

A Till I started work.

Q261 And you think that could've been April or May?

A Yeah, I think so.

Q262 Not sure of the exact date?

A I think I provided it to Mr. Webster.

Q263 I looked through that this morning and I --

A I didn't bring anything with me.

MR. CONLEY:

That's okay, you didn't have to. I just never saw a start date at the Sheriff's Office and it may be in here and I just overlooked it but in any event --. Yeah, it just told us since you were terminated, just told us you went to work for Sheriff Hunt, it didn't give us a date; but if you could find out your date of hire and provide that to Mr. Webster.

RANDY LYNN BRYANT:

I can. It was before my unemployment run out.

Q264 So you didn't have to go without --

A No.

Q265 -- money.

A [No additional response.]

Q266 While you were off working on unemployment, did you incur any additional bills or are you behind on anything as a result of your period of unemployment?

A No, I've kept everything up.

Q267 Did you incur any medical expenses because you didn't have health insurance?

A No, sir.

Q268 The health insurance that they offer at the Sheriff's Office, it's the same that you get through -- you got through the Fiscal Court, isn't it?

A It probably is. I don't go to the doctor unless --

Q269 So you don't really know --

A I'm glad to have it in case something happens but I don't use it.

Q270 Are there any other folks that we've not discussed that you are willing to tell me, anyways, that have knowledge or information about Mr. Williams' decision to terminate you?

A No.

Q271 Are there any folks out there that we've not talked about that you're willing to disclose who would be able to tell us about conversations that they've had either with Mr. Williams or with you about your termination?

A No, sir.

Q272 I've got your work history here and it looks like you started as Deputy Jailer in 2003, right?

A Yes, sir.

Q273 Then it says in '06, you went to work for the Court, Fiscal Court --

A Yes, sir.

Q274 -- doing maintenance.

A Yeah, that's true.

Q275 Where did you do maintenance?

A In the Courthouse for Judge Thompson previous to Judge Marshall.

Q276 The County Courthouse, right?

A Yes; the old County Courthouse.

Q277 Old County Court, not the new Justice Center.

A Yes, sir. I did maintenance till the Code Enforcement job came open and I got it.

Q278 In 2007.

A Yes. I was already working at the Courthouse when I got the job.

Q279 Now, we talked a little bit about, you know, some of the emotional issues you may be dealing with as a result of the termination. Can you explain for me in a little more detail some of the things you may be dealing with?

A Well, I've got three children that I'm wanting to put through school and I've got one in college. I mean I need ever penny I can get to try to put them through college.

Q280 And I'm not trying to put words in your mouth, Mr. Bryant, but maybe I can just help me understand what you're telling me. You're stressed because of financial --

A Yes.

Q281 -- restraints?

A Yes, sir.

Q282 Worried about being able to pay for college for the kids and that kind of thing?

A Yes, sir.

Q283 So it's more of an anxiety issue then?

A Yeah.

Q284 Stress and anxiety?

A Yeah.

Q285 What about depression? Have you dealt with any depressive episodes or issues?

A Just -- you know, just worrying.

Q286 Right; but you haven't gone to see a doctor nor --

A No, sir.

Q287 -- a counselor.

A No, sir.

Q288 Have you noticed any health problems that may have resulted from worrying around about this with your stomach, or your heart, or anything?

A No, sir; just -- just worry, you know, stress.

MR. CONLEY:

I'm gonna go off record real quick. I need to check with Mr. Shaw about something.

(Reporter's Note:

There being no objection, the record was stopped briefly, continuing thereafter, as follows:)

Q289 When you were hired as Code Enforcement Officer, was there a particular process to that or did they just say, "Hey, do you wanna -- you want this job?" I mean how did that --

A Well, I asked for it.

Q290 Who did you ask for it?

A I asked Lon May and the County Judge.

Q291 Why was it you were particularly interested in that job?

A Ah, it was just something that I's always interested in. I thought, you know, helping the county was a -- a good -- good job. I wanna help my county. My children's gonna grow up in the county.

Q292 Did you fill out a formal application for it?

A I'm sure I did.

Q293 Did you have to do an interview or anything?

A Well, I already worked there so they all knew me. I don't know if I did or not.

Q294 You don't recall?

A I don't recall.

Q295 We talked about your duties, you took me through all that. Did you fill out job forms?

RANDY LYNN BRYANT:

Did I fill out job forms?

Q296 Like if you went to check out a complaint or something, did you have to fill out a form?

A Yeah; Notice of Violation.

Q297 Notice of Violation; and what did you do with those?

A I stored them in my office.

Q298 Were they paper?

A Paper, yes.

Q299 Do you know what happened to them?

A Yes, I do; because somebody called and asked me about one of the cases that was going to Court, and I called Joey Reynolds and asked him about them, and he said they destroyed them all.

Q300 When did that happen?

A About a month ago.

Q301 So they've been destroyed?

A That's what he said.

Q302 Reynolds told you that?

A Yes, sir.

Q303 Did he say who destroyed them?

A He did; said he got rid of them.

Q304 You did not. When you left office, were they still there?

A Yeah, in boxes and filing cabinets.

Q305 In your office?

A Yes, sir.

Q306 Did you have like a filing system for them?

A I just had them stacked in boxes and probably the year dates maybe.

Q307 Where did you get the forms from? Were they something that you printed off of a computer program?

A Yes, sir.

Q308 Was it like a AOC form or --

A I think we just made our own up and printed them off.

Q309 Did you keep any of them?

A No.

Q310 You don't have any of them?

A They probably still have -- use -- use the same one.

Q311 Did you have a work computer?

A Yes, sir.

Q312 What happened to it?

A They were turned back in.

Q313 Was it a laptop?

A Yes.

Q314 Who did you turn it in to?

A I think I left it in the Solid Waste Office for Clem Stambaugh, I think's the guy they rented them from.

Q315 Clem Stambaugh?

A Yeah.

Q316 Did you delete anything off the computer before you turned it in?

A Yes, they told me to clear ever thing off of it.

Q317 Who told you that?

A I can't remember if the Judge or whoever we were turning them back in.

Q318 Was there anything in particular that you cleared off of that that you can recall?

A Probably ever thing.

Q319 And you think that Judge Williams told you to do that?

A No. I never did work with Judge Williams.

Q320 Who told you to clear the computer?

A Well, I'm not certain. I think Ben Hale told us to clear them.

Q321 This was before Williams took office?

A Oh, yeah; I never -- I never gotta work the first minute for Judge Williams.

Q322 When would you have turned this computer in or left it at the Solid Waste Office?

A Probably that Friday before I got terminated. Maybe. You know, I'm not real sure on the exact day.

Q323 Before you got the letter?

A Yeah.

Q324 How much interaction did you have with the general public? I mean was it just when you went out and did investigations or --

A Well, they would call the office with complaints.

Q325 And you took those calls?

A I had -- no, Sharon May took most of them. They would fill out a form. I had a box and I'd go in there and get the complaints out of my box and go out and check on them and try to resolve them.

Q326 Did you do any -- I don't wanna say patrolling but, did you do any kind of going out, driving around looking for stuff?

A Yes.

Q327 Did you have a schedule for that or was that just something you did when you had time?

A Just when I's on my way, lot of times I'd try to wait and get three or four in the same area so I wouldn't be running back and forth all over the county.

Q328 And if you saw something while you were out, you would stop and --

A Yes, sir.

Q329 -- deal with it?

A [No additional response.]

Q330 Did the County provide you a vehicle?

A Yes, sir.

Q331 What were you driving?

A At the end there, I was driving a Trail Blazer.

Q332 Trail Blazer, that's a Chevy, right?

A Yes, sir; like a small Tahoe, used. I think the Health Department gave it to them.

Q333 Did you spend a lot of time in your vehicle or more time in the office?

A Probably more time in the vehicle.

Q334 Where was your office located?

A In the Annex Building.

Q335 There in Prestonsburg?

A Yeah, behind the old Courthouse.

Q336 Are you familiar with Christian Appalachian Project?

A Yeah, a little bit.

Q337 Did you ever have to go over there and pick anything up?

A I'm not sure; I don't think so.

Q338 Do you know whether or not anyone made -- not talking about your employer but like public -- anyone in the public ever make complaints about your job or what you were doing?

A Like I say just people that -- you know, that I would have to talk to about a problem, some of them would call and complain. Sometimes if somebody wasn't home during the day, I would have to go out in the evenings; and I remember one time in particular somebody complained 'cause I's there at eight o'clock and they wanted to know why anybody would come out at eight o'clock and it was because they wasn't there in the daytime.

Q339 Do you remember who that was?

A I don't remember their name but they live -- I remember where they lived.

Q340 Where'd they live?

A They lived out by Dewey Lake.

Q341 Do you know an address?

A I can get it but I don't know it. It's upon the hill straight across the spillway.

Q342 Any of those complaints ever progress to more of a formal setting, like where you had to -- you know -- go before the Judge or anything like that?

A No, they came in and complained to the Judge, I think, or called the Judge.

Q343 Anything written that you're aware of?

A Not that I'm aware of.

Q344 Do you recall the names of any of the folks that would've come in and complained?

A No.

Q345 Do you own or help manage any rental property?

A I do.

Q346 How many units?

A Probably about seven.

Q347 Where are they located?

A Printer, Wayland and Auxier.

Q348 Did you ever do any work on either your property or your rental property while you were on County time?

A No, sir; but I have during the day. Like if I had to go out in the evenings, I would take a couple hours off during the day and then go out in the evening.

Q349 Comp time?

A Yes.

Q350 Did you run that through the Judge or do anything --

A Yes, sir.

Q351 Oh, you did, like Ben Hale?

A. Yes, sir. He said long as I got my eight hours in, I's on salary, it didn't matter. If I needed to go out in the evenings, just take it off during the day and work -- long as I got a eight-hour day, eight and half hours.

Q352 So Ben was flexible --

A Yeah.

Q353 -- or Judge Hale was flexible with you.

A With the time, you know, I mean long as I got it; it didn't matter if it was four to -- Imean eight to 4:30. If I took off a hour or two during the day if I had something I needed to do and I could work that evening.

Q354 When you went out and interacted with the public, were you I guess a direct representative of the Fiscal Court?

A I was.

Q355 When you were dealing with if I had a property issue, you came out to me --

A And told you how to fix it.

Q356 You were telling me with the authority of the Fiscal Court, correct?

A Yes, sir.

MR. CONLEY:

Alright, Mr. Bryant, those are all the questions I have.

EXAMINATION

By Mr. Webster

Q1 Randy, you started out in the Courthouse as maintenance?

A Well, when I come over to the Courthouse. I started out as a Deputy Jailer at the jail for the Fiscal Courts.

Q2 Rough job, isn't it?

A Yeah, aggravating.

Q3 Wrestling drunks?

A Yeah.

Q4 And then you --

A Very stressful job.

Q5 -- went to the Courthouse, started doing maintenance.

A Maintenance.

Q6 Which is what, working toilets and things?

A Yeah; cleaning, any kind of maintenance, carpenter, whatever.

Q7 And that could formerly been known as the janitor?

A Yeah.

Q8 And you went from the janitor to the Code Enforcement Officer.

A Yes, sir.

Q9 Were you proud of that path?

A Oh, yeah, I worked --

Q10 How'd you get there?

A I worked my way up. I just worked my way up. I worked hard.

Q11 Would you have been or were you bothered by being fired from that job notwithstanding the money?

A Yeah; I thought I's doing something good for the county. I've lived in Floyd County all my life and I'm raising my children in Floyd County.

Q12 Was it --

A I want it to be --

Q13 -- embarrassing?

A -- a better county.

Q14 Were you embarrassed by being fired?

A Yeah.

Q15 Did you have to explain that to people?

A Yeah; yeah, they would ask me why I got terminated. I told them I didn't -- didn't understand it.

Q16 There was a democratic primary between Hale and Rose.

A Yes, sir.

Q17 You were for Hale.

A Yes, sir.

Q18 Open and active.

A Open and active.

Q19 Hale loses to Rose.

A Yes, sir.

Q20 Rose is then running against Robbie Williams who is an independent, is that correct?

A That's correct.

Q21 You talked about two or three different people getting assurance from Robbie that you would not be terminated if what?

A If I didn't campaign against Williams.

Q22 In other words, he was trying to keep you from being against him.

A Yes, sir.

Q23 And you weren't against him --

A No, I --

Q24 -- or for him.

A Right. That's correct.

Q25 You chose whatever -- whoever you voted for, the public would not have known that.

A No, they wouldn't have.

Q26 When Mr. Williams got elected, he had been assuring your friends that for their support --

A Yes.

Q27 -- you'd have your job.

A Yeah.

Q28 And there's nothing wrong with your work.

A Right.

Q29 Then he tells you, "Sorry, but I've got to put my own people in there." Is --

A That is exactly --

Q30 -- that the sum of it?

A That's exactly what happened. He told me personally that it didn't have anything to do with my job performance.

Q31 That's when you went to his office on the highway.

A Yes, sir.

Q32 How long before he was sworn in was that?

A A few weeks.

Q33 Well, the election was in, what, November; and --

A I've got it noted. I may have give you the paper but I've got the exact times and dates.

Q34 You were starting -- you had heard that he's gonna --

A I'd heard it, yeah.

Q35 You went to see him.

A I did.

Q36 That first time is when he told you that he was --

A Putting his people in the Courthouse.

Q37 -- putting his people; and when he delivered you the letter making that official, there wasn't much talk.

A No. Told me later on down the road if something come open, he would try to get me back but it never did happen.

MR. WEBSTER:

That's all.

RE-EXAMINATION

By Mr. Conley

Q1 Real quickly, Mr. Bryant. You testified just a second ago you're embarrassed by the termination, correct?

A Yes, sir.

Q2 But now, you -- you felt like you did a good job.

A I do.

Q3 Mr. Williams never told you you did a poor job.

A No, sir.

Q4 You never felt like you were terminated over your job performance, correct?

A No.

Q5 When people asked you why you were terminated, you didn't tell them it was for political reasons; you just told them you didn't know?

A Well, I told them I guess I's on the wrong bandwagon, according to him.

MR. CONLEY:

Alright, those are all the questions I have, thank you.

MR. WEBSTER:

That's all.

(DEPOSITION CONCLUDED)

STATE OF KENTUCKY

COUNTY OF PIKE

I, Shirley S. Hensley, Notary Public in and for the State of Kentucky at Large, whose commission as such will expire March 25, 2021, do hereby certify that the foregoing deposition of **RANDY LYNN BRYANT** was taken at the time, place, and for the purposes stated in the caption hereto.

I further certify that said taking was pursuant to Notice To Take Deposition; that appearances were as stated in said caption; that the witness was first duly sworn by me before testifying; that said testimony was taken by me in shorthand notes and by tape-recording and later reduced to typewritten material herein, which is a true, full, complete and accurate transcript thereof; that the parties did not request the reading and signing of the deposition of said witness.

IN TESTIMONY WHEREOF, I have hereunto set my hand at Pikeville, Kentucky, this 9th day of January, 2020.

SHIRLEY S. HENSLEY, REPORTER