UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT PIKEVILLE
NO: 7:19-CV-46-REW

RANDY BRYANT PLAINTIFF

VS. **DEPOSITION OF DEFENDANT TAKEN ON BEHALF OF PLAINTIFF**

FLOYD COUNTY FISCAL COURT AND ROBERT WILLIAMS, FLOYD COUNTY JUDGE EXECUTIVE, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY DEFENDANTS

************************************************************

DEPONENT: ROBERT WILLIAMS
FLOYD CO. JUDGE EXECUTIVE

DATE OF DEPOSITION: FEBRUARY 17, 2020

************************************************************

**I N D E X**

CAPTION . . . . . . . . . . . . . . . . . . . . . 2

WITNESS
ROBERT WILLIAMS
Direct Examination by Mr. Webster. . . . . . 3-36

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . 37

CERTIFICATION . . . . . . . . . . . . . . . . . . 38

************************************************************

**ATHA MAE MAGGARD**
Court Reporter
P.O. Box 1481
Prestonsburg, KY 41653
(606) 886-3377
athamaggard@gmail.com

************************************************************

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT PIKEVILLE
NO: 7:19-CV-46-REW

RANDY BRYANT PLAINTIFF

VS. **DEPOSITION OF DEFENDANT TAKEN ON BEHALF OF PLAINTIFF**

FLOYD COUNTY FISCAL COURT AND ROBERT WILLIAMS, FLOYD COUNTY JUDGE EXECUTIVE, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY DEFENDANTS

************************************************************

The Deposition of Robert Williams was taken before Atha Mae Maggard, Notary Public in and for the State of Kentucky at Large, at the Law Offices of Hon. Lawrence R. Webster, 206 Second Street, Pikeville, Kentucky, on the 17th day of February, 2020, at the Hour of 1:00 p.m., for the purpose of using the same upon the trial of the above-styled action now pending before the U. S. District Court on behalf of the Plaintiff, Randy Bryant.

************************************************************

APPEARANCES

| | |
|---|---|
| FOR THE PLAINTIFF, RANDY BRYANT | HON. LAWRENCE WEBSTER<br>P.O. BOX 712<br>PIKEVILLE, KY 41502 |
| ALSO PRESENT | MR. RANDY BRYANT |
| FOR THE DEFENDANTS, FLOYD COUNTY FISCAL COURT, ET AL. | HON. JONATHAN SHAW<br>P.O. DRAWER 1767<br>PAINTSVILLE, KY 41240 |

************************************************************

The Witness, Robert Williams, being first duly sworn, was examined and deposed as follows:

DIRECT EXAMINATION BY HON. LAWRENCE R. WEBSTER:

Q What is your full name?
A Robert Keith Williams.
Q Birthdate?
A XXXXXX XX, 19XX.
MR. SHAW: I ask that that be redacted on the record.
Q What is your home physical address?
A That's 139 Cedar Trace, that's in Prestonsburg, 41653.
Q Do you, do you still practice, I'll call it accounting, CPA work?
A Yes.
Q What is that address?
A That's 1421 North U.S. 23, Prestonsburg.
Q And you're, what's your--are you a CPA?
A I am not.
Q What, what is your level of education?
A Bachelor's degree.
Q From where?
A Morehead State University.
Q When was that?

A 19-, graduated in 1992.
Q What was your major in?
A That was business with an emphasis in accounting.
Q And you, where have you worked since college?
A After graduating, I, I was in the National Guard for seven (7) years.
Q Full-time?
A No, no, some, no, just part-, part-time. Then I worked for Burchett & Bottoms from '92 to '96, which was a CPA firm there in Prestonsburg. And in 1996, I went in business for myself.
Q And, and that's, that is the...
A Accounting office.
Q ... accounting office?
A Yes, sir.
Q How many employees do you have?
A Currently one (1).
Q What is its name?
A Elizabeth.
Q Last name?
A Hatfield.
Q Where does Elizabeth live?
A Auxier.

Q Are you married?
A Yes.
Q What is your wife's maiden name?
A Jenkins.
Q And what is her first name?
A Virginia.
Q Where was she raised?
A Martin.
Q The Jury panel in these federal cases comes from about five (5) counties, and I can't remember them all, Pike, Martin, and Floyd, and Knott, and Letcher, maybe more. What families are you related to in that area by family name?
A Me?
Q Yes, sir.
A My family is in Pike County. Fuzzy Keesee was a family member. The Fouch girl that used to be Judge Executive up here was my second cousin.
Q How is that?
A The Preeces.
Q Second cousin because?
A Through the Fouch. The Gibson girl that was Judge up here, she was a second cousin.
Q Is Stanley your great uncle?
A Yes, uh huh.

Q Okay.
A That's family, Homer Preece, uncle.
Q Bet speaks of you.
A Uh huh (affirmative), Fouch, Preece, England. My mother, my mother, grandmother owned the Pearl's Diner there in Williamson for years and a hotel.
Q What was her name?
A Mabel.
Q Last name Williams?
A It was, no, she was an England. She was an England. But primarily my, my family, my family is in the Belfry area.
Q Okay. Do you have any relatives in Martin County?
A I do. My, my grandmother was a Mar-, she was a Marcum, maiden name. She was a Marcum.
Q Do you have any relatives in Floyd County?
A Just brothers and sisters, immediate family.
Q What are their names?
A Charlie Williams and Mike Williams.
Q Where does Charlie live?
A Charlie lives in Wheelwright.
Q And Mike?
A Mike lives in Prestonsburg.

Q Okay. Do you have any relatives in Letcher County?
A No.
Q Do you have any relatives in Knott County?
A No.
Q Did you ever hold a public office before you ran for judge?
A No, I did not.
Q You did not?
A No.
Q Had you been involved politically, like with boards or commissions?
A Politically, no.
Q Okay. Now you ran for office and was elected in, what, what year was the year of your election?
A General, it was the general election in November of 2018.
Q And you were sworn in a year ago?
A January the 7th of 2019.
Q Okay. And you, who was your opponent?
A John DeRossett and Jim Rose. John ran as the Republican, and Jim ran as the Democrat, and I ran as an Independent.
Q And Jim Rose, in, in the final election, did either of those support you?

A Did...
Q Either DeRossett or, or Rose?
A Well, no, they were running against me.
Q Oh, that's right. You ran--I'm sorry.
A I had, yeah, we went through, that's right, I went through that because I was an Independent.
Q Had any, did anyone who got beat in the primary come around to support you, such as Ben Hale for instance?
A Well, Ben didn't, no.
Q Alright.
A Ben did not.
Q Did anyone that you know of that lost in the primary?
A No, not that I'm, not that I can recall.
Q Now what kind of a campaign did you wage? Was it person to person or media or a combination?
A I did a lot of door to door.
Q Okay.
A I did a lot of door to door.
Q Did you...
A I mean I had a lot of folks in these communities that were, that helped me.
Q Did you go by yourself or did you usually find somebody in the community?

A Usually found someone in the community that had good connections, and we would go talk to families.

Q Did Joe Reynolds ever go?

A Yes.

Q Where did he go with you?

A We went to different places. Fire departments, he, he had a lot of good connections with the fire departments and folks there, good rapport.

Q How many trips would you say he made in your behalf with you?

A Probably four (4) to five (5).

Q And beginning when? I don't mean date-wise. Was it three (3) months before the election, six (6) months?

A Yeah. Yeah, we started, I started early in the election, in the election cycle, because I didn't have to run a race in, in May.

Q Now would it just be you and him travelling?

A No. Sometimes there would be others with us.

Q Who were some of the others that might have travelled with you and he?

A Maybe someone there at the fire departments, you know, that we would visit. You know, there

at Allen, the Rudder guy that was the chief there, you know, we would--but I mean, you know, we didn't go out to homes. These was like with trips when we'd go to the fire departments and make, you know, go in and, and talk to the, the fire departments and things of that nature...

Q By that, you mean...

A ... like ten (10), for ten (10) minutes.

Q ... they would gather up and you would talk to them briefly or just...

A Well, no. They, if they would have meetings, I would, I would, I would show up and just kind of, you know, tell them my platform and what my, what I wanted to do for the fire departments going forward, because the fire departments have been neglected a lot over the years and didn't have proper equipment and training and things that they needed.

Q Did Joe ever introduce you at those places like, like you would a speaker, "Here's Robbie Williams."?

A No. He just, we'd just go in and he'd just introduce me to folks...

Q Okay.

A ... that he may, may have had a relationship with.

Q Did he have employment at that time?

A He, I think he was self-employed at that

time he was doing this. He, he does a lot of the equipment work for the fire departments. That's what, he has a company and they do--he, he fixes pumps and fire trucks and things of that nature.

Q What is the name of his company, if you know?

A I don't know the name of his company.

Q And did he campaign for you on Facebook?

A Yes.

Q Did you save any of that?

A No, I didn't.

Q What did he say, if anything stands out, on Facebook?

A Nothing that really stood out beyond-- other people campaigned for me on Facebook.

Q Did...

A I mean he wasn't the only one. I probably had twenty-five (25) to thirty (30) other people that campaigned for me on Facebook. Would you like their names?

Q Well, possibly.

A Okay.

Q Let's see in a minute. Facebook, was there some routine to his Facebook where like every day a post or...

A No. We didn't coordinate anything. We

didn't coordinate anything. I mean if he just, you know, we had, we had--I certainly feel we, I was running a different campaign than folks that ran in the past in that we had a lot of people who were invigorated with the fact that there's new blood, someone new coming into the system. And we had a lot of folks that jumped out and helped us that ordinarily were not involved in politics.

Q Okay.

A So this wasn't just, just Joe Reynolds; there was, you know, we, we probably had--there was probably forty (40) people I went door to door with during the campaign.

Q When he would post something on Facebook, would it come to you?

A Would, would he come to me?

Q No, would the posting.

A I don't know that it would specifically come to me, but...

Q Did he soc-, did he campaign for you on other forms of social media that you know of?

A Not that I'm aware of.

Q Now when is the first time you discussed employment with him?

A With Joe, that, it was after the election was over. Joe had expressed an interest in, in potentially

getting a job that, that had benefits. He was self-employed. And Joe and I talked briefly about that. There was...

Q Do you remember where you were?

A I, I do not. I do not.

Q What, what did you say in that talk?

A We just talked about the possibility of, you know, that if something came up that, you know, I would look at, you know, trying to, trying to get him a job.

Q Did he ever discuss particular jobs with you that he would like?

A No, but, you know, here's the, the thing going through my campaign, and you can ask anyone who understood, I never promised one person a job. I made a point not to promise anyone a job during my campaign. And when we, when we discussed the, the position, what I was trying to do was gather information as to roles that these people would play in my administration once hired because basically there, there were no, there were no job descriptions, zero (0) job descriptions there at the courthouse. So basically what I'm trying to do is I'm trying to find ways to, to get the, the best bang for the buck out of these employees, and I want folks that I can cross-train. And I felt that Joe's qualifications, after talking to him, it was, he was someone that I, I felt like I

would like to bring into the mix.
Q Did you hire others the same way?
A I did, yes.
Q Were they your supporters?
A Steve Little was, yes.
Q Who else?
A That was, he's the only one that was a supporter that was hired that was, that actively.
Q Who, who did he replace?
A Steve replaced, Steve, Steve, let me see-- Larry, Larry stepped down.
Q Larry?
A The, the guy who was over the, the purchasing officer.
Q What is his last name?
A I don't know Larry's last name. We've probably got it.
Q And Larry, and Steve got that job eventually?
A Yes, he did when Larry, Larry sent word to me that he wanted to retire.
Q Okay. Now did, did, did you replace anyone else by hire?
A Did I replace anyone else?
Q Yes.

A No, but there was folks that retired and I re-, or moved on and I replaced them.
Q Did you ask them to move on?
A I did not. I did not. I think there was maybe an assumption that it was probably going to be, you know, so, you know, they, they moved on.
Q What--explain what you were about to say there. What assumption?
A Well, like Sharon, for instance, Sharon had applied for a job at the Big Sandy ADD. Sharon May, she, she went to work there; so she had, she had another job that was, I guess, offered to her. She was executive secretary. The other person was the gal who ran the senior citizens. She, ah--I, I never heard from her. She just disappeared; so we hired someone in that position.
Q Who did you hire for that one?
A Trudy Gabbard.
Q Was she a supporter?
A Trudy was, I guess, yes. I mean we were friends.
Q Okay. But Sharon...
A Now, now can you define supporter. I want, I mean...
Q Somebody who...
A ... are you just saying somebody that

voted for me or somebody who got out here and actively campaigned for me?

Q Well, whatever level such that you were aware of it.

A Okay. Well, I mean I, I--we were friends. I would be under the assumption.

Q So you thought it was a fair assumption that she would be for you?

A Yes.

Q Okay.

A I never, I never asked her that question.

Q So Steve Little was replaced--Steve Little replaced somebody who had went on to another job?

A Larry ultimately--I think Larry, right now, is currently not working.

Q Okay.

A He had sent word to me that he was ready to go to retirement. And Larry stayed around and helped for a couple of months when, once Steve was brought in. And after a couple of months there, Larry saw that we had a good relationship, and he asked if he could, if I could find someplace to fit, you know, work him in down there to give him a job. And Larry was, you know, a good guy, but, you know, I just didn't have any, anywhere to put him at that time after he had said he was going to move on. I'm not in

the business of political retribution with these folks--because you have to realize, from top to bottom, the folks that I retained were not for me.

Q You recognize the difference between retribution, being opposed to somebody, and rewarding your own people? There is a difference?

A Uh huh (affirmative). I, I, yes, I do understand that.

Q And your, when did you become aware of the nature of the code enforcement officer's job? When did you find out what that entailed?

A What the job entailed?

Q Yeah. You said earlier there were no job descriptions. How did you know what that job was about?

A Just historically over the years what Mr. Bryant did, you know, throughout the course, throughout the course of the years. I mean, you know, they'd say call who, you know, if you've got a problem with your trash or you've got a probably that a house needs torn down, something of that nature.

Q So you were kind of aware of it over the years?

A Yes, I was, uh huh.

Q Okay. And you, when you were--you assumed office New Year's Day?

A January 7th.
Q 7th. And did you, were you then--I don't know how to ask you. You, you then became in charge of the records?
A Correct.
Q And did you take over the records of the code enforcement office?
A We did.
Q What happened to the laptop?
A There was nothing on the laptop. The laptop is completely blank, and there are no records past 2011. There's a few pictures, but there were no--we found one folder dated 2015, and all those records are in my possession.
Q You found no other records?
A No, sir.
Q Were any removed?
A No, sir.
Q Were any destroyed?
A No, sir.
Q Were any erased electronically?
A Not unless it was done prior to us taking office; nothing under my, my control.
Q Who took--when did, when did Joe start that job, the first day you did?

A Yes, he did.
Q And between--did he then take over the records immediately that were in, what was in his office?
A Yes, he did. Uh huh (affirmative). They, the office was in total disarray. There was just, there was pictures laying--it was just, it was a mess.
Q Did you--when is the first time you spoke to Randy, then quote, "Hoot", end of quote, Bryant about, about his employment or anything related to that?
A The day we met in my office.
Q Was that after election?
A That was after the election.
Q Before swearing in?
A Correct, yeah. I saw where he alleged we met prior to the election. We did not.
Q You, did you ever bump into him prior to the election?
A I bumped into him in Auxier, me and Dale Johnson. He was in a county vehicle with a county uniform on working on a rental property on county time at two (2:00) o'clock in the day.
Q Who will, who will say that?
A Dale Johnson.
Q And who is that?
A That is the gentleman he put down as a

character reference.

Q Okay. What rental property was it?

A It was there in Auxier.

Q What was he doing to it?

A I'm not certain what he was doing.

Q You said he was in a truck?

A He was in a county vehicle.

Q How do you know he was working on something?

A Well, he told us he was down here working with one of his renters. We pulled over to, to talk to him and said, "How is the election going?" He said, "Everything is good.", thumbs up, that was the extent of it.

Q Okay, okay. Now do you have any other personal observations about his job performance other than that one?

A About his job performance?

Q Yes.

A To, to me, I think his job performance is on display in the public every day, what he, what he was not doing. I mean you could go around the county and see that there was nothing being done as far as the--he was over the code, not only the code enforcement, but the litter abatement, picking up the trash around the county, so.

Q Now the question was specifically what did

you see, and you're talking more like everybody knew.

A Uh huh (affirmative).

Q What did you see?

A What did I see? I seen a lot, myself, I would see him at restaurants sitting around the course of a day.

Q Where?

A Just different restaurants around the county.

Q You're saying that happened multiple times?

A Oh, multiple times, yes

Q What restaurants?

A Just different, different restaurants around town, Billy Ray's, places like that. I mean there was, ah...

Q Billy Ray's is where county employees, a lot of them would have lunch, right?

A Correct, and, and up at Martin, up at the Triangle Market and Giovanni's and all these places.

Q Where is Giovanni's?

A There in Martin.

Q Is that when you were campaigning you would see him or...

A No, just general, generally. Also through

my accounting office, I also sell insurance; so I am on the road a lot.

Q I see.

A And I would see him out in different places.

Q Now how could you formulate an opinion that that's somehow or another was neglectful of his duties?

A Well, I certainly believe that, myself, I have a, a certain standard that I would want my employees to live up to, especially if they're out here in the public every day. I would want them to appear as though they're doing their job in, in a way that the taxpayers' dollars are being spent the way they should be spent.

Q What specifically caused you to believe otherwise about Randy?

A There didn't seem to be a lot of work taking place.

Q Just explain that. Do you mean...

A I mean if you've got, if you're, if you're at work, you're in here working, you're not, you're not sitting around at street corners talking to people in a car or in, in restaurants and hanging out. You know, you're, you should be working. And I just, and I certainly felt like that there was no guidance for the gentlemen that was on the litter abatement crew. You would see them sitting

all over the county, not picking up trash. It, it was his job to direct them as well.

Q Where did that job duty come from? Is that described in the code or somewhere?

A No, but that was his responsibility too.

Q Who--describe his responsibilities. Where could I go look it up?

A I guess, I guess that would be between him and Ben Hale as to what his respons-, I mean he, he directed --those guys reported to him. They told me they reported to Hoot.

Q Okay. But his official, I'll call them official duties, most--the, the administrative code has various categories of employees and things like that. Is there something that somebody could read and find out what the code enforcement officer does other than building permits and inspections and things like that?

A No, there's not.

Q Okay. It's subjective?

A Well, it is subjective, but I mean it's just like your secretary. If she goes and gets the mail every day, there's going to be an assumption that she's the gal that goes and gets the mail and she reports to you if you don't have a job duty, and that's the same thing there. These employees reported to him on a daily basis.

Q Now when, so when Joe comes in, the new guy, how did he know what to do?
A I, I sat Joe down and I explained to him what I wanted him to do.
Q What did you tell him?
A I told him he better get his butt out here and work, and he better make sure that these guys are working. The, the guys that were on the code enforcement prior that worked for Hoot, the guys quit, said they couldn't work, that we was overworking them for what they were getting paid, so.
Q And they quit?
A They quit.
Q All of them?
A Uh huh (affirmative).
Q They weren't fired?
A They were not fired.
Q Were they replaced by supporters of yours?
A They were not.
Q How were they replaced?
A Joe hired, you know, I guess Joe hired whoever he hires.
Q You don't know who he hired?
A I don't have a clue.
Q Did you give him free rein?

A I do, uh huh (affirmative). I trust his judgement.
Q And then the fiscal court approves?
A Yes, sir.
Q Name some of the people that he hired.
A I don't know their names.
Q You don't know them at all?
A I do not know them at all. I couldn't pick them out of a police lineup.
Q Name some of the people that quit because when Joe got in and you got in, they were being overworked compared to the old days. Name some of those.
A I don't know them. That was just a statement that Joe had made.
Q Joe said that to you?
A Uh huh (affirmative).
Q Now did you physically go in the code, code enforcement office before you were sworn in?
A No.
Q When is the first time you were in there after that?
A After I was sworn in, I made a visit to all the offices after I was sworn in.
Q And how do you know there were no records?
A We went through, we went, we went, kind of

went through everything and said, "This is what we've got." And I said, you know, "Get everything put in the filing cabinet." There was pictures strewn all over the floor and files. I mean it was just a mess. There was no organization.

Q Now when you, you said you ran into Hoot at Auxier, and he said thumbs up, everything was okay, was that the extent of your conversation with him?

A That was it.

Q Did you speak to him or--you, you said, "How is the election going?"

A Yeah, "How is the election looking?" And I mean I, we, I've never had a conversation with, with Mr. Bryant other than the, the meeting we had in my office.

Q Were you uncomfortable asking a county employee about how the election was going? Did that not seem a bit over the line to you?

A No. He openly campaigned for Ben Hale. I mean I don't know why it would, just to ask a question.

Q Well...

A I mean he got out here and put up signs and campaigned in a county vehicle and, and, you know, I mean he, he, he was on, on county time out here during the election. It was no secret.

Q And you, did you ever ask him to just

remain neutral in the fall?

A No. We never, we never spoke.

Q When is the next time you spoke to him after that?

A After the Auxier or the, or when I spoke to him at my office?

Q The next time after...

A Well, we met at Auxier and then we met at my office to discuss his employment.

Q Who set that meeting up?

A I did--I, I, I'm not certain. I'm not certain who set it.

Q Did you send, did you send for him?

A Probably. I had met with the county attorney on how to proceed if I was going to make the change.

Q So you had done knew you were going to make a change?

A Well, I was considering, uh huh (affirmative).

Q And what, at that meeting, what, what would have caused you not to terminate him? You, you were considering; you met with him and decided to do it. What were the criteria at that meeting that you were consulting to decide whether or not to keep him or have somebody else?

A Well, at that meeting, I, I just felt it was, ah, at, at--you know, like I said, I had spoken with, I had spoken to Joe about his qualifications.
Q And what were they?
A Well, Joe had, he went to college at PCC. He had over twenty-five hundred (2,500) training hours with the state of Kentucky.
Q On what?
A Through, for the, for the fire departments. He, he's a certified EMT, Hazmat. And what I wanted to do was consolidate and cross-train my code enforcement guy to help with the EMS, so I could get more out of my EMS guy to help with the, the FEMA projects we were behind on from 2014. So I needed someone that could fill that role and understood computers and spreadsheets and had good organizational skills.
Q Are you saying the code officer needed help?
A The code officer, no, I didn't say that the code officer needed help.
Q You wanted to cross-train somebody to help do the job?
A Well, I wanted to cross-train them when we have folks that are out of the office, so we need, you know, need someone to step in and help, that people can do

multiple jobs; that's what we do in the real world, not in, not in county government, is we have folks trained to do, do different jobs.

Q This job of code enforcement officer is not a job that political affiliation is important, is it?

A I wouldn't think so.

Q It's not a policy-making job?

A No, it's not a policy-making position.

Q Okay.

A But we do, we do take recommendations from our code enforcement officer as we're getting ready to do a, a joint agreement with some of the communities based on his suggestion to, to lend them support on doing some, you know, tearing some homes down and cleaning up some of these communities.

Q When you met with him the other, the second time, that was where, at your CPA office?

A Yes, at my office, uh huh (affirmative).

Q Tell us what, what all was said during that meeting.

A I told...

Q I'm sorry, I said CPA.

A At, at that time, I'm, I'm--I've got a recording of that conversation.

Q Oh.

A I've got, and I'm sure he does too.
Q No, I don't. I've asked for--you have it recorded though?
A I, I do have a recording.
Q With you?
A I do not, no, but I do have a recording of that conversation.
Q Why did you record it?
A Because Hoot was telling everyone around the courthouse that him and Barry Davis, if, in the event they got fired, they were going to get an attorney and sue us.
Q Uh huh (affirmative). So you recorded, and because you were recording it, you were particular about what you said, I take it?
A Yes, sir.
Q You weren't about to be on that tape saying anything that would hurt you?
A Well, I didn't say anything that was inappropriate or not true.
Q Did he know you were recording it, Hoot?
A I'm sure he probably had the, the assumption. I made the assumption that he was recording me.
Q Why?
A That's just, that's, that's--I just made

that assumption.

Q Had I been provided that tape as requested heretofore, what would I have heard?

A That it was a, just a cordial conversation. I just basically said, "Hoot, I'm not going to retain your services.", and it was nothing to state that it was for political reasons or there was no political retribution. Hoot, Hoot did not campaign against me in the election. Hoot was not for me, but Hoot did not campaign against me. There was no political retribution.

Q Did you make any comments on there about his job performance?

A I, I don't know exactly what I said.

Q Did you ever say anything to the effect that, "Nothing to do with you. I just wanted to get somebody in there, somebody else.", words to that effect?

A I wanted to get someone that I felt...

Q Excuse me a minute. You're telling me what you wanted. The question is what did you say?

A I said that I wanted someone who fit the role more appropriately for what I wanted going forward.

Q Okay. Had you checked Hoot's personnel record before that day?

A I had not. I did not have access to that.

Q Did you all have a disciplinary system

down there, write-ups or suspensions or anything?
A There's nothing.
Q Is it in the code and you all just don't do it?
A No. They, they didn't even--they just adopted administrative code here recently. We've been this winter trying to get that, that stuff put into place.
Q What individuals, if any, do, do you think could offer evidence in this case that supports your position?
A What position would that be?
Q Your position that, that I'll summarize, and I hope fairly, that you, you replaced Randy Bryant because he wasn't performing his job to your, to the reasonable expectations of county government.
A Probably, I mean I, I didn't, I didn't-- I'm the judge. I, I didn't confide in anyone. These are decisions that I made personally. Because at the end of the day, I'm the person that has to stand accountable to these taxpayers about the individuals that I employ.
Q In other words, if we have a trial in this case, are you going to call X to the stand and say, "X, didn't Randy do this wrong?" or "Did Randy fail to do this?" Have you got people in mind for that?
A I, not at this time,

Q Okay. Did you ever tell anyone outside of Randy Bryant's presence that Randy wouldn't lose his job?

A I did not.

Q Did you tell Hubert Spurlock that?

A I don't know who Hubert Spurlock is.

MR. WEBSTER: Is that the right name?

MR. BRYANT: (Inaudible).

Q Shoat?

A No, I didn't discuss.

MR. SHAW: Sorry. For the record, is it Hubert Shoat or is it...

MR. WEBSTER: Shoat Spurlock.

OFF THE RECORD

Q When you met with Hoot at your accounting office and tell him he wasn't going to be rehired, did you talk to him again after that any?

A The only thing I can recall in talking to him after that was at the courthouse the day that we had our meeting that Friday, and he would not relinquish the vehicle keys to the gentleman that, that was replacing him. He said that I couldn't make him give him the keys until I was sworn in on Monday.

Q There was a letter telling him he was terminated or not going to be rehired or something. When was that prepared?

A I don't remember preparing a letter saying he was going to be terminated.
Q Did you direct somebody to do so?
A Not that I'm aware of.
Q Okay.
A And some of this stuff, I mean, you, you know, things were moving so fast, things were moving so fast that, and I come in contact with so many people through the course of the judge's office and my other jobs, that I don't want you to think that I'm, you know, not being when I--you know, every little meeting, I, I--but if there was something of substance, I would have remembered it.
Q Are you saying there were no notices of violation emanating from the code enforcement officer during Randy's time there? You said you found none.
A What, what do you mean? I'm sorry. Could you rephrase the question.
Q You said you didn't find any documents in Randy's office indicating any code enforcement.
A Didn't find anything after 2011; I found one file.
Q Are you saying there were none then?
A There were none when we arrived.
Q I'll rephrase it. I didn't ask you well. Are you saying no violations were noticed then or are you

saying...
A There's no documentation.
Q No documentation.
A I'm not saying that there wasn't any. There, there may have been, but...
Q And if there was, then there should have been documentation?
A I would think so.
Q Okay. Has anyone else accused you of political discrimination following your election?
A No, sir. If nothing else, folks were very forthright and, and encouraging the way that we carried ourself in not promising jobs to everyone in the county. And I mean ninety (90%) percent of my staff were not for me in the election that still, still remain on the job.
Q Did you, do you have an assistant or deputy county judge?
A No, that position was eliminated. That position was created about three (3) months before I took the, took the job, and there was really no reason to have, to have that position.
MR. WEBSTER: Stop there a little bit. I'll go out and speak to him.
OFF THE RECORD
Q Were there regular work hours for code

enforcement officer under Randy's tenure? Was it like beginning time and ending time?

A I was under the assumption, yes. I mean, you know, there, obviously there's...

Q What time of the day did you run into him at Auxier?

A It was about two (2:00) o'clock.

Q What makes you remember that?

A Because Dale had taken off work that day, and we pulled out and it was a little bit of a joke there between us, you know, "Here he is on work time down here working on his apartments, driving a county vehicle, in uniform."

Q Did the county vehicle go home with him when he went home?

A Yes.

MR. WEBSTER: That's all.

MR. SHAW: That's it.

* * * * * * * * * * *

Thereupon the taking of the deposition of ROBERT WILLIAMS was concluded.

* * * * * * * * * *

CERTIFICATE OF SERVICE

This is to certify that the foregoing deposition has been mailed to the following persons:

ORIGINAL TO:

Hon. Lawrence R. Webster
P.O. Drawer 712
Pikeville, KY 41502

COPIES:

Hon. Lawrence R. Webster
P.O. Drawer 712
Pikeville, KY 41502

Hon. Jonathan Shaw
PORTER, BANKS, BALDWIN & SHAW
P.O. Drawer 1767
Paintsville, KY 41240

This the 5th day of March, 2020.

____________________________
Atha Mae Maggard
Freelance Court Reporter

CERTIFICATE

STATE OF KENTUCKY)

COUNTY OF FLOYD )

I, ATHA MAE MAGGARD, Notary Public for the State of Kentucky at Large, do certify that the foregoing deposition was taken at the time and place stated in caption; that the witness was duly sworn before me before testifying; that the deposition was taken by me in shorthand notes and on tape recorder and later transcribed on the computer by me; and that the foregoing 37 pages of typewritten material is a true and correct copy of my said shorthand notes and tape recordings.

Given under my hand this 5th day of March, 2020.

____________________________
Atha Mae Maggard
Notary Public
State of KY at Large

My commission expires
August 6, 2020