UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| RANDY BRYANT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 7:19-CV-46-REW |
| | ) | |
| FLOYD COUNTY FISCAL COURT | ) | |
| and | ) | OPINION & ORDER |
| ROBERT WILLIAMS, *individually and in* | ) | |
| *his official capacity*, | ) | |
| | | |
| Defendants. | | |

\*\*\* \*\*\* \*\*\* \*\*\*

This case arises from the alleged unconstitutional termination of a Floyd County Fiscal Court Code Enforcement Officer. Plaintiff Randy Bryant, the sacked employee, moves for summary judgment on the sole claim (First Amendment retaliation) of his complaint and requests a damages hearing. DE 14 (Motion); DE 1-1 (Complaint). Defendants, Floyd County Fiscal Court and Robert Williams, in his individual and official capacities, move for summary judgment. DE 18. The parties have fully briefed the matter. *See* DE 22 (Plaintiff's Response); DE 23 (Defendants' Response); DE 24 (Defendants' Reply). The matter is ripe for review. The factual questions evident in the record are what juries exist to answer; the Court **DENIES** the dispositive cross-endeavors.

I.  **BACKGROUND**

Bryant began working for the Floyd County Fiscal Court in 2003 as Deputy Jailer. DE 15 (Randy Lynn Bryant Dep.) at 17.[1] In 2007, Bryant was hired as the Code Enforcement Officer by

---

[1] Throughout, the Court cites to internal deposition pagination (rather than CM/ECF page designations).

1

then County Judge Executive Robert Marshall. Bryant Dep. at 16. When Marshall was Judge Executive, Bryant campaigned for him. *Id.* at 18–19. In 2014, Ben Hale won the election for County Judge Executive. *Id.* at 40. Bryant continued as an employee under Judge Hale.

During the 2018 primary election, Bryant campaigned for Hale. *Id.* at 28. Hale lost the primary to fellow democrat Jim Rose. *Id.* at 29. Williams ran for County Judge Executive as an independent in the 2018 general election. DE 16 (Robert Williams Dep.) at 7. Bryant decided to remain neutral during the general election and did not campaign for any candidate. Bryant Dep. at 29. At some point during the election,[2] Bryant claims to have been introduced to Williams by Wes Gearheart. *Id.* at 26. During this conversation, Bryant claims that Williams assured him that his campaign was not out "to terminate anybody[.]" *Id.* At another point during the election, Williams and Dale Johnson stopped to talk to Bryant at one of Bryant's rental properties.[3] *Id.* at 32–33; DE 16 (Robert Williams Dep.) at 26. Williams allegedly assured Bryant his job was safe. Bryant Dep. at 32-33. Williams eventually won the general election.

After the election, Bryant made it known around the Fiscal Court that he would sue the County and Williams if he was terminated. Williams Dep. at 30. At some point after the election, Williams met with different individuals to discuss the administration transition. *See* DE 18-2 (Affidavit of Steve Little); DE 18-5 (Affidavit of Keith Bartley); DE 19-1 (Affidavit of David Layne). During these meetings, and sometime before assuming office, Williams decided to no

---

[2] The record does not definitively place any of these "pre-election" conversations in the primary election cycle or the general election cycle.

[3] The contents of this discussion are disputed. *See* Bryant Dep. at 32–33 (claiming the conversation included discussion of his job and the campaign); Williams Dep. at 26 (claiming the conversation did not include a discussion of Bryant's job); DE 18-4 (Affidavit of Dale Johnson) (claiming that the conversation did not include a discussion about the job or a request to stop campaigning against Williams)

longer retain Bryant as Code Enforcement Officer and instead hire Joe Reynolds for the position.[4] Reynolds had been an active supportive of and volunteer for Williams during the election. Williams Dep., at 9. Sometime before Williams took office, Bryant met with Williams.[5] Bryant Dep. at 36–38; Williams Dep. at 29. At this meeting, in Williams's business office, Bryant claims that Williams articulated his decision not to retain him: Williams was going to hire one of his own supporters. Bryant Dep. at 38 (referencing Williams's description: "it didn't have anything to do with politics, far as me campaigning or whatever but the people that helped him get elected and put in office, that he was gonna give them jobs in the Courthouse"). Williams claims that he told Bryant that he was not retaining his services because he wanted someone who "fit the role more appropriately for what I wanted going forward." Williams Dep. at 31.

Williams assumed office on January 7, 2019. *Id.* at 7. Williams terminated Bryant the same day. Bryant Dep. at 38; DE 14-4 (Termination Letter). That very morning, the Fiscal Court had approved Williams's employee slate. *See* DE 18-8 (Resolution of Hire).

Bryant filed a complaint against Williams, in his individual and official capacities, and the Floyd County Fiscal Court in Floyd Circuit Court on June 12, 2019 with one claim: First Amendment retaliation under 42 U.S.C. § 1983. DE 1-1 (Complaint). Defendants timely removed the case on June 20, 2019. DE 1. The parties, following discovery, filed cross-motions for summary judgment.[6] *See* DE 14 (Plaintiff's Motion); DE 18 (Defendants' Motion).

---

[4] The record does not reflect precisely when Williams made the decision. The proof supports that he determined to terminate Bryant at some point prior to the 7th. He had already told Bryant and had consulted the County Attorney and others about his options.

[5] Williams claims that there is a recording of this conversation. Williams Dep. at 30–31. The tape recording is not referenced in the parties' briefing and is not in the record. The conversation in Williams's office is disputed and crucial; the Court is chagrined by the phantom tape's absence.

[6] The Court applies the same standard of review to cross-motions for summary judgment as when only one party files. *McKim v. New Market Techs., Inc.*, 370 F. App'x 600, 603 (6th Cir. 2010). The Court evaluates each motion on its own merits, drawing all reasonable inferences against the

## II.  STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the movant to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient

---

party whose motion is under consideration. *Beal ex rel. Putnam v. Walgreen Co.*, 408 F. App'x 898, 902 (6th Cir. 2010). Summary judgment for one side is not necessarily appropriate simply because the parties file cross-motions for summary judgment. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001) (footnote omitted). Indeed, "'the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" *Id.* (quoting Wright, Miller & Kane, *Federal Practice & Procedure* § 2720 (3d ed. 1998)).

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

In *Matsushita*, 106 S. Ct. at 1356, the Supreme Court "authorized an inquiry on summary judgment into the implausibility of inferences from circumstantial evidence, not an inquiry into the credibility of direct evidence." *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994) (internal quotation marks and alterations omitted) (interpreting *Matsushita*). Put differently, it is "error for [a] district court to resolve credibility issues against the nonmovant[.]" *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008). Under the rubric, the Court reserves fact finding for the fact finder.

### III. ANALYSIS

#### a. Defendants' Motion for Summary Judgment

*First Amendment Retaliation*

A prima facie case of First Amendment retaliation under 42 U.S.C. § 1983 requires proof "(1) that there was constitutionally-protected conduct; (2) an adverse action by defendants sufficient to deter a person of ordinary firmness from continuing to engage in that conduct; and (3) a causal connection between the first and second elements—that is, the adverse action was motivated at least in part by plaintiff's protected conduct." *Eckerman v. Tennessee Dept. of Safety*, 636 F.3d 202, 207 (6th Cir. 2010) (citing *Sowards v. Loudon Cnty.*, 203 F.3d 436, 431 (6th Cir. 2000)).

Political association is a well-established right protected by the First Amendment because "political belief and association constitute the core of those activities protected by the First Amendment." *Elrod v. Burns*, 96 S. Ct. 2673, 2681 (1976). "Support of a political candidate falls within the scope of the right of political association." *Soward*, 203 F.3d at 432 (citing *Elrod*, 96 S. Ct. at 2681). The Defendants obliquely claim that Bryant's silence (or political neutrality) is not protected conduct but provide no law to support the claim. *See* DE 18-1 at 9. In fact, "[r]efusal to support a political candidate, like support for a political candidate, is protected by the First Amendment." *Stevens v. Speck*, CIVIL ACTION NO. 15-9-DLB-HAI, 2016 WL 5745108, at *6 (E.D. Ky. Sept. 30, 2016) (citing *Elrod*, 96 S. Ct. at 2681). Bryant's conduct undoubtedly satisfies the first prong—his decision to stay neutral in the general election was constitutionally protected.[7]

---

[7] *See Welch v. Ciampa*, 542 F.3d 927, 939 (1st Cir. 2008) ("The freedom not to support a candidate or cause is integral to the freedom of association and freedom of political expression that are protected by the First Amendment. . . . Punishing an employee for failing to support the prevailing party 'unquestionably inhibits protected belief and association.'" (first citing *Rutan v. Republican Party of Illinois*, 110 S. Ct. 2729, 2738 (1990); then quoting *Elrod,* 96 S. Ct. at 2683)); *Barry v.*

6

An adverse action is one that "would likely chill a person of ordinary firmness from continuing to engage in [the plaintiff's] constitutionally protected conduct." *Sowards*, 203 F.3d at 433. "[D]ischarge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote" are adverse action paradigms in the employment context. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). The record is clear that Williams terminated or refused to rehire Bryant, and the parties do not dispute that this decision was adverse.

"To satisfy the third prong of their First Amendment retaliation claim, plaintiffs must show that their terminations were motivated at least in part by the exercise of their free speech rights." *Burgess v. Paducah Area Transit Authority*, 387 F. App'x 538, 545 (6th Cir. 2010) (citing *Mount Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 87 S. Ct. 568, 576 (1977)). "[T]he employee must point to 'specific, nonconclusory allegations reasonably linking her speech to employer discipline.'" *Bailey v. Floyd Cnty Bd. Of Educ.*, 106 F.3d 135, 144 (6th Cir. 1997) (quoting *Wright v. Illinois Dep't of Children & Family Servs.*, 40 F.3d 1492, 1500 (7th Cir. 1994) (citations removed)). Thus, the terminated employee "may not rely on the mere fact that an adverse employment action followed speech that the employer would have liked to prevent." *Bailey*, 106 F.3d at 145. There must be a causal link between "the speech in question [and] the defendant's decision to dismiss." *Id.* The showing can be made "'through direct or circumstantial evidence, including showing temporal proximity between engaging in protected activity and suffering an

---

*Moran*, 661 F.3d 696, 704 (1st Cir. 2011) ("In evaluating claims of political discrimination, the Court has been clear that constitutional protection extends to the decision *not* to associate with a political party or faction. . . . Thus, 'coercion [of belief] is equally unlawful when it is directed toward apolitical career employees as when it is directed towards a party's political opponents.'") (first citing *Rutan*, 110 S. Ct. at 2738; then quoting *Acosta–Orozco v. Rodriguez–de–Rivera,* 132 F.3d 97, 101–02 (1st Cir.1997)).

7

adverse employment action[.]'" *Benison v. Ross*, 765 F.3d 649, 661 (6th Cir. 2014) (quoting *Eckerman*, 636 F.3d at 209).

Viewing the record in a light most favorable to Bryant, there is enough evidence to establish a sufficient causal link. Bryant claims that Williams spoke to him, at some point, about not wanting Bryant to campaign against him. Bryant Dep. at 32–33. [8] Furthermore, Bryant's conversation with Williams after the election, if believed, explicitly shows that Williams sought to reward his political supporters (of which the neutral Bryant was not one). Bryant Dep. at 37–39; 62 (referencing Williams's description: "Putting his people in the Courthouse."); 63 ("I's on the wrong bandwagon, according to him."). Though Williams denies this, he also suggests an odd dichotomy between retribution against an opponent and reward to a patron. *See* Williams Dep., at 17 (Q: You recognize the difference between retribution, being opposed to somebody, and rewarding your own people? A: Uh huh (affirmative). I, I, yes, I do understand that."), 31 ("Hoot, Hoot did not campaign against me in the election. Hoot was not for me, but Hoot did not campaign against me. There was no political retribution."). In the Court's view, these are different descriptions of what would be the same likely improper act. Firing a political opponent is no different from firing a neutral (for being neutral) and hiring a political supporter. If the job hinges on the state of political loyalty, the affected worker's rights are in the crosshairs.[9] That Bryant in

---

[8] The record does not reflect, and the parties' briefing does not attempt to create, any coherent timeline of the election and the parties' conversations. Both depositions place the first conversation before the election. Bryant Dep. at 34; Williams Dep. at 26. But whether this conversation took place during the *primary* campaign or the *general* campaign is a mystery. The fog on these conversations is not meaningless: the proximity of protected activity to an adverse action substantiates, to some degree, the causal link. *See Benison*, 765 F.3d at 661.

[9] The Court finds it curious (maybe benign, maybe not) that, during the fateful Auxier encounter, Williams's question to county employee Bryant was, "How is the election looking?" Williams Dep., at 26.

fact hired a person (Reynolds) into the slot that worked the community in support of his election is additional factual fodder in this calculus.

Finally, the temporal connection between the November 2018 election and the January 2019 termination is not too attenuated for a reasonable juror to infer a retaliatory motive. It is clear that Williams discussed and considered Bryant's fate in the short window between the election and his administration's start. On this record, Bryant has eked out a prima facie case of First Amendment retaliation.

With the prima facie case established, "the burden then shifts to [Williams] to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Benison*, 765 F.3d at 658 (internal quotation marks omitted). "These are issues of fact, however, and may not be decided on a motion for summary judgment unless the evidence 'is so one-sided that one party must prevail as a matter of law.'" *Boger v. Wayne County*, 950 F.2d 316, 322 (6th Cir. 1991) (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989)).

This is not such a case. The record reflects a dispute between Bryant, Williams, and Williams's witnesses on the quality of Bryant's job performance. Williams claims that job performance was his lone basis for terminating Bryant. *See* DE 18-1 at 15. Defendants' submitted affidavits purport to confirm (often reliant on hearsay) that this was *the reason for dismissal*, but do not confirm, certainly not conclusively, that Bryant's job performance was subpar. *See* DE 18-2; DE 19-1; DE 20-1. On the other hand, Bryant stated, multiple times, that he never received any disciplinary action in relation to the way he performed his job, was never informed he had poor job performance, and had only been aware of job-related complaints that were based solely on unhappy citizens he enforced the county code against. *See* Bryant Dep. at 27–28, 30, 32, 35–38,

9

55–56, 61–63. Further, Bryant testified that Williams expressly assured him that his termination did not relate Bryant's work quality. *See Id.* at 38 ("He told me . . . it didn't have anything to do with my job performance."). Further, Bryant had an explanation for his work hours, *id.* at 56, and attributed missing files to conduct of his replacement, Joe Reynolds. *Id.* at 50. There is a genuine dispute of material fact on whether Bryant's job performance was deficient and whether any deficiencies influenced the firing decision. Again, per Bryant, Williams ascribed the firing to political patronage. This, with the other noted elements of the record, creates a jury question.

*Patronage Dismissal*

Williams argues, in parallel or alternatively, that the Code Enforcement Officer position falls into the *Elrod/Branti* exception where "party affiliation may be an acceptable requirement for some types of government employment." *Branti v. Finkel*, 100 S. Ct. 1287, 1295 (1980). Thus, per Defendants, a patronage decision would be lawful as to this slot.

"To determine whether political affiliation is an appropriate requirement[,] it is the inherent duties of the position itself *and* the duties as envisioned for the new holder which must be examined, rather than the duties as performed by the person holding the position at the time of the alleged violation." *Hager v. Pike Cty. Bd. Of Educ.*, 286 F.3d 366, 372 (6th Cir. 2002) (citations omitted). "[A] plaintiff's actual duties may nonetheless serve as evidence of the duties inherent in the position." *Feeney v. Shipley*, 164 F.3d 311, 320 (6th Cir. 1999). In the summary judgment context, "[t]he issue . . . is whether Defendants have established that no genuine factual issue exists as to whether political affiliation may appropriately be considered with respect to the position in question." *Sowards*, 203 F.3d at 435 (internal quotation marks omitted).

The Sixth Circuit has identified four categories of positions for which political affiliation may be an appropriate consideration:

> **Category One:** positions specifically named in federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;
>
> **Category Two:** positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions;
>
> **Category Three:** confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority, or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors;
>
> **Category Four:** positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies.

*McCloud v. Testa*, 97 F.3d 1536, 1557 (6th Cir. 1996). A solid waste commissioner has been deemed a Category One position where the position required "a delegation of broad discretion by the fiscal court and the county judge executive to properly fulfill all duties set forth in the aforementioned code." *Stanley v. Pike Fiscal Court*, Civil Action No. 99-36, 2000 WL 3580043, at *5 (E.D. Ky. June 6, 2000).

Defendants[10] argue that the Code Enforcement Officer position is either a Category One or Category Two position. DE 18-1 at 14. Defendants support this claim in only two sentences; they point to Bryant's deposition where he said that he interacted with the public as a "direct representative" of the Fiscal Court. Bryant Dep. at 57. They then conclude that Plaintiff's deposition proves that "Plaintiff was charged with the discretionary authority to carry out the law or other policies of the county in dealing with code violations and solid waste abatement." DE 18-1 at 14. Bryant disagrees, arguing that "[t]here is simply noting in the record that [the Code

---

[10] The parties essentially ignore the Solid Waste Coordinator part of Bryant's job.

11

Enforcement Officer] exercised anything other than ministerial duties." DE 22 at 4. Bryant claims that the position's duties "are to enforce county ordinances relevant to dumping, burning, dilapidated buildings and obstructions of county roads." DE 14-3 at 2; *see also* Bryant Dep. at 14. The Floyd County nuisance ordinance reasonably confirms this view, at least as a fair reading. *See* DE 18-7 (Ordinance No. 04-002) ("00.03 Abatement Procedure . . . It shall be the duty of the Code Enforcement Officer to serve . . . a notice upon the owner and occupant of any premises on which any nuisance exists in violation of the provisions of this Ordinance."). The duty to act is categorical as to *any nuisance*, defined within section 00.01 of the Ordinance.

Defendants do not meet their burden, at the summary judgment stage, sufficient to grant the sought relief. Initially, the perfunctory argument Defendants attempt to use to support their claim is unavailing. The Court is not required to search the record to unearth the facts to support a movant's claim. *See Penn, LLC v. Prosper Bus. Dev. Corp.*, 600 F. App'x 393, 403 (6th Cir. 2015) ("'Judges are not like pigs, hunting for truffles; that might be buried in the record'") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

Moreover, taking the evidence in a light most favorable to Bryant, there is (at worst) a factual dispute over whether political affiliation is crucial to or inherent in the Code Enforcement Officer. Defendants provide no proof that the position itself is "named . . . in municipal law to which *discretionary* authority [exists] with respect to the enforcement of that law" or that the position has been delegated Category One authority. *McCloud*, 97 F.3d at 1557. Defendants submitted the Floyd County Administrative Code and Floyd County, Kentucky Ordinance No. 04-002. *See* DE 18-6 (Code); DE 18-7 (Ordinance). The Administrative Code makes no reference to a Code Enforcement Officer. The Ordinance does not help Defendants' claim, either, as the Ordinance does not place discretionary authority in the hands of the Code Enforcement Officer.

This Ordinance does not describe any latitude the Code Enforcement Officer carries in making decisions regarding the Abatement Procedure.

The Court has reviewed the record as developed and finds that a material dispute of fact exists as to whether Williams "envisioned" the Code Enforcement Officer to have duties encompassing Category One or Category Two. Williams, importantly, states in deposition that the Code Enforcement Officer is **not** a policy making position. Williams Dep. at 29 ("No, it's not a policy-making position."). Those words are weighty. In discovery, Defendants expressly denied that "political belief or affiliation or connection was a factor in the job that the Plaintiff formerly held and from which he was not rehired." DE 14-7, at 2 (stating "[n]o, although the code enforcement officer is a direct representative of the Floyd County Fiscal Court"). Williams's own words largely foreclose viewing the Code Enforcement Officer job as one befitting the patronage exception.

As for Williams's vision for the role, his deposition only bears out that he wanted the Code Enforcement Officer to take on more responsibility in cross-trained positions. *Id.* at 13–14, 28, 31. Williams and Floyd County Treasurer David Layne both claimed to have made job descriptions for positions across the Fiscal Court. *See* Williams Dep. at 13; DE 19-1. None of these job descriptions depicting Williams's vision appear before the Court. On this record, the Code Enforcement Officer's duties "remain too ill-defined for us to adjudicate the issue as a matter of law. . . . Because the dispute in this case stems from obscurities in the facts, not the law," denial of summary judgment is the result. *Lane v. City of LaFollette*, 490 F.3d 410, 422–23 (6th Cir. 2007) (citations omitted).

13

*Qualified Immunity*

"Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 102 S. Ct. 2727, 2738 (1982)). Qualified immunity protects an official unless the plaintiff demonstrates that "(1) there is a genuine dispute of material fact as to whether the official deprived her of a constitutional right, and (2) the right was clearly established at the time of the official's actions such that a reasonable official would have known that her actions were unconstitutional." *Hicks v. Scott*, 958 F.3d 421, 430 (6th Cir. 2020). The Court may address the two prongs in any sequence. *See id.*

Williams "is entitled to qualified immunity only if the *law* is unclear, not the facts." *McCloud*, 97 F.3d at 1556. As discussed above, the law is clear that the patronage exception turns on the inherent duties of the position. Furthermore, the Code Enforcement Officer position, like the solid waste coordinator in *Stanley*, *could* potentially qualify under the *Elrond/Branti* exception. But, there are factual disputes on this record (barely, perhaps, given Williams's concessions) about the *duties* of the Code Enforcement Officer. "Whether a party is entitled to qualified immunity is typically a question of law for the court to decide." *Everson v. Bd. Of Educ.*, 123 F. App'x 221, 228 (6th Cir. 2005). "[W]hen the facts on which the question of immunity turns are in dispute, however, it is for the trier of fact to make the factual findings underlying resolution of the qualified immunity issue." *Id.* Simply put, qualified immunity is inappropriate at the current stage.[11]

Finally, Williams argues that he "sought and received the advice of the Floyd County Attorney regarding the decisions made" and that he should not be held liable based upon good

---

[11] Defendants do not make any prong two argument, so the Court does not address it.

faith reliance on advice of counsel. DE 18-1 at 19. Bryant responds stating that the defense is inappropriate because the evidence "does not show what facts [were] disclosed." DE 22 at 5.

The Circuit has recognized that "there are circumstances in which reliance on the advice of counsel may support a claim of qualified immunity." *York v. Purkey*, 14 F. App'x 628, 633 (6th Cir. 2001) (citing *Mineer v. Call*, 993 F.2d 1547 at *6 (6th Cir. 1993) (unpublished table decision)). However, the defense is rare and applies only under "extraordinary circumstances." *Cochran v. Gilliam*, 656 F.3d 300, 309 (6th Cir. 2011) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 318 (6th Cir. 2006)). Four factors pertain when determining whether a public official follows legal advice: "1) whether the advice was unequivocal and specifically tailored to the particular facts giving rise to the controversy; 2) whether complete information was provided to the advising attorney(s); 3) the prominence and competence of the advising attorney(s); and 4) how soon after the advice was received the disputed action was taken." *York*, 14 F. App'x at 633 (citing *V-1 Oil Co. v. Wyoming*, 902 F.2d 1482, 1489 (10th Cir. 1990)).

Again, Williams does not adequately establish the defense. The argument surfaced in a perfunctory and conclusory manner in one sentence at the end of the defense motion. *See* DE 18-1 at 19. Substantively, the Court is unpersuaded. Floyd County Attorney Bartley simply stated the basic First Amendment law. DE 18-5 ("I advised Judge Williams that under the circumstances and facts presented to me that he could hire and fire at will anyone he directly supervised – as long as the decision was not based upon protected conduct or activities. I advised Judge Williams that he could not fire someone for political reasons."). Bartley did not, as far as we know, advise Williams he could terminate Bryant's employment and hire a political supporter. Moreover, viewing the evidence in Bryant's favor, Williams ignored Bartley's advice: he decided to terminate Bryant (a

non-supporter) and hire Reynolds (a supporter). *Cf. York*, 14 F. App'x at 633 (denying the defense where the defendant "did not follow [the attorney]'s legal advice").

*Official Capacity Claims*

Defendants argue that Williams, in his official capacity, and the County should be granted summary judgment because "the allegations of the complaint are directed towards the individual actions of Defendant Williams." DE 18-1 at 18. Bryant alleges in his complaint that "[t]he Defendant, Floyd County Fiscal Court, is liable for the unlawful conduct described herein of the Defendant, Robert Williams." DE 1-1 at 2.

To begin, respondeat superior is not a basis for county liability under § 1983. *See Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019). "Instead, a plaintiff must show that 'through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.'" *Id.* (internal quotation omitted). There are four ways to make this showing: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Id.* (internal citation omitted). This same standard applies to any official capacity claim as to Williams individually. "Suing a municipal officer in his official capacity for a constitutional violation pursuant to 42 U.S.C. § 1983 is the same as suing the municipality itself, and thus a successful suit against a municipal officer in his official capacity must meet the requirements for municipal liability stated in [*Monell v. Dep't of Soc. Servs. Of City of New York*, 98 S. Ct. 2018 (1978)]." *Kraemer v. Luttrell*, 189 F. App'x 361, 366 (6th Cir. 2006).

While a county cannot be held vicariously liable, "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances."

16

*Pembaur v. City of Cincinnati*, 106 S. Ct. 1292, 1298 (1986). In one such circumstance, official liability may be imposed "where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 1300. Whether an official has final policymaking authority is a question of state law. *City of St. Louis v. Praprotnik*, 108 S. Ct. 915, 924 (1988).

Defendants argue that "Plaintiff has not alleged and cannot show that a policy or custom of the Floyd County Fiscal Court was the moving force behind the alleged deprivation of Plaintiff's rights." DE 18-1 at 18. Bryant's only reference to the official capacity claim is contained in the complaint—Bryant does not support this claim, by argument or fact, in any of the briefing. Moreover, the parties fail to address whether Williams was the final policymaking authority for the harm at issue, specifically the termination decision.[12] The complaint, though, does not

---

[12] The question is murky. Williams derives his authority to hire and fire county personnel from state statute. Ky. Rev. Stat. § 67.710 ("[The county judge executive's] responsibilities include, but are not limited to, the following: . . . (7) Exercise with the approval of the fiscal court the authority to appoint, supervise, suspend, and remove county personnel (unless otherwise provided by state law); . . . ."). The Circuit has held that the statute does not allow for § 1983 liability to be placed on the fiscal court directly because that court does not have "the authority to reappoint [an unappointed employee] to county employment[.]" *Christian v. Belcher*, 888 F.2d 410, 415 (6th Cir. 1989). The Circuit later commented on the holding in *Christian*, stating "*Christian* thus compels the conclusion that Judge/Executive Floyd, not the Fiscal Court, was Pulaski County's 'final policymaking authority' with respect to the hiring decisions at issue in the case now before us." *Whittle v. Floyd*, 202 F.3d 271 at *3 (6th Cir. 1999) (unpublished table decision). However, the Circuit has also held that "[t]he fact that a person who has authority only to recommend, and whose recommendations can be implemented only upon subsequent approval by a governing body, decides to make no recommendation does not convert the recommender into a final policymaker." *Adkins v. Board of Educ. of Magoffin County, Ky.*, 982 F.2d 952, 959 (6th Cir. 1993). The Court has many questions, and these chase away a dispositive ruling as to the County. There are indications that Williams held the actual decisional authority. After all, he communicated the termination to Bryant even *before* he took office. Further, he expressly sought the County Attorney's counsel, pre-administration, and heard "he could hire and fire at will . . . as long as the decision was not based upon protected conduct or activities." DE 18-5. This raises doubt over whether the Fiscal Court's role was simply a rubber stamp of Williams's employment decisions. *See Arendale v. City of Memphis*, 519 F.3d 587, 602 (6th Cir. 2008) (when discussing *Praprotnik*, "even if the allegedly unconstitutional decision is initially made by a subordinate official, when the decision is appealed to and affirmed by an official with final authority over the matter, the municipality may be held liable for this affirmance"); *but see Hull v. Cuyahoga Valley Joint*

17

expressly limit Bryant's claim to vicarious liability; for now, Bryant has not ceded the question of Williams' status as a final policymaking authority. If Williams had final policymaking authority, and Williams acted unconstitutionally, the Fiscal Court could be liable. Without briefing, the Court is reticent to resolve the tension, in this fraught field, and say either party is entitled to summary judgment on the official liability claims. The parties may pitch the issue at the Rule 50(a) stage, but they must be ready to answer the final policymaking authority question. Accordingly, the Court **DENIES** Defendants' summary judgment motion as inadequately supported by law. The individual capacity and municipal claims survive for trial.

### b. Plaintiff's Motion for Summary Judgment

Bryant contends that he is entitled to summary judgment on the issue of liability. *See* DE 14. Viewing all of the evidence in the record in a light most favorable to the non-movants, Williams and the County, the Court finds that, for reasons that parallel but invert the prior analysis, a jury must decide the claims. Williams's motivation is key, and his story differs sharply from Bryant's. Williams denies ever referencing patronage, and he cites Bryant's job performance as the decisional key. There are many witnesses to support Williams in his case. Summary judgment is not about tabulating proof or identifying the credible. Accordingly, the Court **DENIES** Plaintiff's motion; a jury must decide why Williams terminated Bryant and the propriety of the decision.

### IV.     CONCLUSION

For the stated reasons:

1. The Court **DENIES** DE 14;

---

*Vocational School Dist. Bd. of Educ.*, 926 F.2d 505, 515 (6th Cir. 1991) ("Plaintiff's argument that Schuck exercises final authority, because the Board allegedly 'rubber-stamps' his recommendations is contrary to *Paprotnik's* [sic] explicit warning not to look beyond where 'applicable law purports' to vest power." (quoting *Praprotnik*, 108 S. Ct. at 925)). The Court will have to resolve this question at trial on a thoroughly developed and argued record.

18

2. The Court **GRANTS in part and DENIES in part** DE 18; and

3. To set this case on track for resolution, the Court **ORDERS** the parties to submit a status report, **no later than January 19, 2021**, addressing the parties' positions on trial readiness, any interest in mediation, and anticipated trial length.

This the 30th day of December, 2020.

Signed By:
*Robert E. Wier* /s/ REW
United States District Judge